

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-12-2000

# Alvin v. Suzuki

Precedential or Non-Precedential:

Docket 99-3245

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Alvin v. Suzuki" (2000). *2000 Decisions.* Paper 195.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/195

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 12, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 99-3245

JOHN D. ALVIN, general partner; PHARMAKON, INC.;
CLINICAL PATHOLOGY FACILITY, INC., a Pennsylvania
Corporation, former General Partner; A DELAWARE
CORPORATION, PRESENT GENERAL PARTNER AS
SUCCESSOR IN INTEREST TO, CLINICAL PATHOLOGY
FACILITY t/a PHARMAKON RESEARCH AND
DEVELOPMENT a limited partnership by and through
JOHN D. ALVIN, the managing general partner

v.

JON B. SUZUKI; UNIVERSITY OF PITTSBURGH MEDICAL
CENTER; CENTRAL LABORATORIES SERVICES, INC.;
UNIVERSITY OF PITTSBURGH

John D. Alvin; Pharmakon, Inc.; and Pharmakon
Research and Development, Appellants

On Appeal From the United States District Court
For the Western District of Pennsylvania
(D.C. Civ. No. 95-cv-01821)
District Judge: Honorable William L. Standish

Argued: January 10, 2000

Before: BECKER, Chief Judge, ALITO and BARRY,
Circuit Judges.

(Filed September 12, 2000)

RICHARD G. LEWIS, ESQUIRE
 (ARGUED)
RICHARD B. SANDOW, ESQUIRE
LOUIS ALVIN, ESQUIRE
Jones, Gregg, Creehan &
 Gerace, LLP
411 Seventh Avenue, Suite 1200
Pittsburgh, PA 15219-2303

Counsel for Appellants

LARRY A. SILVERMAN, ESQUIRE
 (ARGUED)
Dickie, McCamey & Chilcote, P.C.
Two PPG Place, Suite 400
Pittsburgh, PA 15222-5402

LAZAR PALNICK, ESQUIRE
University of Pittsburgh Medical
 Center
200 Lothrop Street
Pittsburgh, PA 15213

Counsel for Appellees

OPINION OF THE COURT

BECKER, Chief Judge.

John D. Alvin, Ph.D, a tenured professor at the University of Pittsburgh ("UPitt" or "the University"), started and operated two successful pharmaceutical companies, Pharmakon, Inc. ("PKI") and Pharmakon, R&D ("PRD"), which competed with university-related commercial activities. He brought this civil rights action alleging that the University contrived to deny him the benefits that inhere in a tenured position to punish him for his entrepeneurial activity. Alvin alleges that he was deprived of expected pay increases, access to work with graduate students, laboratories, faculty functions, and other faculty privileges, and that his reputation was damaged in the process. He also contends that his tenure in the UPitt Pharmacology Department was improperly severed and that

2

he was transferred to a tenured position in the Dental School without his consent.

Resolution of this appeal centers on Alvin's compliance with the University's grievance process. Alvin contends that the procedures failed him. He proffers evidence of extensive correspondence between himself and several members of the University's administration. He claims that he followed the grievance procedure laid out in the faculty handbook, but that he was never afforded a hearing in which he could defend himself and explain both the propriety of his conduct and the unjustness of the deprivations he alleges that he suffered. The gravamen of Alvin's suit is therefore that he was deprived of his Fourteenth Amendment right in the property of his tenure without due process of law. Named as defendants were UPitt, Dr. Jon B. Suzuki, Dean of UPitt's School of Dental Medicine, and two health care providers connected with the University--the University of Pittsburgh Medical Center and Central Laboratory Services, Inc. Alvin seeks damages and injunctive relief under 42 U.S.C. S 1983 and Pennsylvania state law.

The District Court granted summary judgment for the defendants on Alvin's S 1983 claim, concluding that he had not demonstrated that he had been deprived of a property interest, and dismissed the pendent state claims without prejudice. The District Court's opinion focused largely on the question whether the alleged incidents comprised such a significant erosion of the incidents of his tenure that he was deprived of a property interest. We do not reach this difficult (and interesting) question, however, because, whether or not Alvin has alleged a property deprivation, he has failed to adduce evidence that the defendants infringed upon whatever property right he possessed without due process of law.

A careful examination of the correspondence demonstrates that, although he sent a battery of letters and complaints to several members of the UPitt faculty and administration, he did not comply with the two-step grievance procedure laid out in the faculty handbook, a procedure that, if complied with, would appear to provide due process. Furthermore, with respect to some of Alvin's claims--that he was deprived of secretarial support, that

3

his yearly evaluations were conducted unfairly, and that his tenure was transferred--he adduced no evidence that he attempted to use the grievance procedure to resolve them. Finally, Alvin claims that pre-termination notice and a hearing was required prior to the transfer of his tenure. The context of that transfer--it was a routine matter as part of a policy decision to transfer the entire faculty--demonstrates that notice and a hearing were not required. In sum, we will affirm the District Court's grant of summary judgment on all aspects of the S 1983 claim.

PKI also sued the same defendants, claiming interference with contractual relations, unfair competition, violations of the Lanham Act, and civil conspiracy. After the plaintiffs attempted both to amend the complaint and to add PRD as a party plaintiff, the District Court dismissed the PKI complaint with prejudice and denied the motion to join PRD despite the absence of either bad faith in the efforts to amend or prejudice to the defendants. The plaintiffs also appealed this order. Given the liberal amendment provisions of Rule 15, the amendment should have been allowed. Because we conclude that the District Court abused its discretion in dismissing PKI's claims with prejudice and refusing to add PRD as a party, we will vacate the judgment and remand for consideration of those claims.

I. Facts

A. Background and Alleged Deprivations

In 1978, after three years of teaching and research at UPitt's School of Pharmacy ("SPharm"), Alvin, a pharmacist and pharmaceutical researcher, was offered, and accepted, a tenured position as an Associate Professor of Pharmacology at SPharm. In 1982, he organized PKI, a commercial venture intended to provide specialty drug services and high-tech drug research to medical organizations, the government, and the private sector. In 1983, PKI, with the knowledge of the Dean of SPharm, rented space from UPitt.

4

According to Alvin, PKI flourished, and its success threatened others in the University-related medical world, specifically the University of Pittsburgh Medical Center ("UPMC"), a non-profit corporation that operates the teaching hospital, and Central Laboratory Services, Inc. ("CLSI"), a non-profit corporation that provides laboratory services to UPMC. UPMC shares administrators with UPitt. Alvin alleges that, starting in 1984, UPMC and CLSI began to pressure UPitt to eliminate or purchase PKI. However, when UPitt presented a takeover package to Alvin and PKI, they were not interested.

Alvin contends that throughout the late 1980s and 90s, UPMC and CLSI provided the same services as PKI and solicited PKI's existing and prospective customer base. He contends that UPitt intentionally contacted PKI's customers and misrepresented the licensed status of PKI. According to Alvin, this threatened PKI's existence, and led him in the fall of 1991 to create PRD, a partnership between himself and the Clinical Pathology Facility ("CPF "). PKI indisputedly sold and leased equipment to CPF and PRD, but according to Alvin it continued to exist as a separate entity throughout the early 90s.

Alvin alleges that during the same time period, UPitt deprived him of many of the benefits that inhere in tenure because of his involvement with PKI and PRD. He avers that from 1991 to 1995 he was denied a salary increase because of his refusal to discontinue his commercial ventures. He claims that from 1992 on, his use of research facilities and laboratories was cut off and the defendants made research difficult and refused to allow him to bring foreign exchange scholars to work on his projects. He contends that he was deprived of administrative services and secretarial support. He submits that his yearly evaluations were conducted unfairly and improperly and that the University refused to process his conflict of interest statements, thwarting his ability to submit grant applications. He claims that he was selectively excluded from departmental meetings, UPitt functions, departmental assignments and duties, and he alleges that he was obstructed in his ability to publish his research and conduct collaborative research. It is undisputed that in

5

1995, Suzuki, the Dean of UPitt's SDM, ordered Alvin to cease all research projects, on the ground that he was researching in violation of UPitt's policy on conflict of interest. However, according to Alvin, Suzuki refused to reveal the basis for this conflict of interest charge.

Alvin asserts that none of these deprivations were warranted, but rather were motivated by the threat he posed the University medical organizations and UPitt's desire to pressure him into allowing it to take over PKI and PRD. The factual record regarding these claims was not developed for this appeal because the defendants have not presented evidence contradicting Alvin's allegations regarding what happened. Instead, they argued that"even if all of the adverse personnel actions alleged in the Complaint occurred in the manner claimed by Alvin, these adverse personnel actions do not, as a matter of law, amount to deprivations of property rights under the Due Process Clause of the Fourteenth Amendment." Appellee's Br. at 11. Therefore, for the purposes of this appeal, we assume all of Alvin's allegations regarding the deprivations to be true.

B. The Faculty Grievance Procedure and Alvin's
        Correspondence

The facts that we do examine are those regarding the faculty grievance procedure and the evidence of the extent to which Alvin attempted to avail himself of the University processes. The University's 1988 Handbook explains the two-step "Faculty Grievance Procedure." Thefirst step, entitled the "Informal Process," requires the professor to contact the chair of the Tenure and Academic Freedom Committee ("TAFC") for an informal investigation. Thereafter, the TAFC mediator should attempt to resolve the complaint: "[e]very effort will be made to achieve a satisfactory resolution within two weeks of the initial contact with the aggrieved person." The mediator is then supposed to write a letter to the faculty member with "whatever findings and recommendations seem appropriate under the circumstances."

6

The second step, the "Formal Process," is available if the informal process does not resolve the dispute. The Faculty Handbook provides that

> [i]n the event that the informal investigation and mediation process does not resolve the grievance dispute, the aggrieved faculty member may submit to the Provost a written statement of the grievance and the circumstances out of which it arose. This written statement will be the complaint that will initiate the formal grievance procedure described below, and must be submitted within 30 days of receipt of the TAFC letter.

The formal process provides for a grievance panel which reviews the case and makes recommendations to the Provost. The faculty member may present documents, evidence, testimony, and retain counsel.

Alvin contends that he attempted to use the University's procedures. What follows is a summary, in the light most favorable to Alvin, of pertinent parts of his correspondence --those letters and communications, which, according to him, demonstrate his attempt to pursue the grievance procedure:

1. On May 17, 1990, Alvin wrote to Dr. Robert W. Koch, Executive Associate Dean of the School of Dental Medicine, complaining about the reallocation of laboratory space and requesting that he be informed "as quickly as possible of the formal appeals procedures that are available to me and any interested colleagues both within and outside of the School of Dental Medicine."

2. On June 6, 1990, Alvin again wrote to Koch, referring in the letter to a meeting about the reallocation of laboratory space a few weeks earlier. He expressed dissatisfaction with the meeting, and asked again if Koch would "please inform [him] of the formal appeals procedures available to [him] within and outside the School of Dental Medicine."

3. Some time in 1991, Alvin met with Dr. Sanford Golin of the TAFC. Golin, according to Alvin, agreed to initiate the grievance procedure regarding the use of research facilities and equipment for post-doctoral exchange students.

4. On July 23, 1991, Alvin wrote Provost Donald Henderson about a number of issues, addressing several disagreements he had with University policies as well as complaints about how the University had treated him, but he did not mention a formal appeal process or grievance.

5. On February 23, 1992, Alvin wrote to Suzuki, stating that he planned to appeal his decision regarding lab space "through whatever procedures are available both within and without the School of Dental Medicine."

6. On June 15, 1992, Alvin wrote to Regis Vollmer, the Chairman of the Department of Pharmacology, complaining of his treatment and asking, among other things:"Lacking an information gathering process in advance, what is the appeal process post facto? Why have my requests for appeal gone unattended since February?"

7. On June 25, 1992, Suzuki wrote to Alvin, stating that: "I have received your appeal of my decision that you vacate the two labs presently assigned to you. Please be advised that your request is denied based on the School of Dental Medicine's policy of assigning space based on research productivity and need." On July 7, 1992, Alvin wrote to Suzuki again, asking about an interpretation of Suzuki's letter ("Does this mean my request for an appeal is denied or that my appeal based on the issues is denied?"), and urging him to reconsider.

8. On September 7, 1992, Alvin wrote to UPitt Chancellor Dennis O'Connor. The letter began, "I am contacting you in the hope that I have not reached the terminus in administrative review on the matters described below. My appeals to the chairman of my department, the dean of my school, and the provost have gone unanswered." The letter went on to detail several of the complaints that form the basis of this claim.

9. On September 16 and September 21, 1992, Alvin wrote to Dr. James Holland, President of the University Senate, detailing his complaints and stating that he was "formally submitting his grievance." Along with these letters he sent "A Grievance Concerning Revocation of Research Facilities."

10. In October 1992, Alvin met with Dr. Tobias, the Chair of the TAFC. Tobias told him that the grievance process would go forward and that Alvin would have an opportunity to present evidence and his point of view:

> Dr. Tobias eventually met with me, in October, 1992. Dr. Tobias assured me that he would conduct the grievance process, that he would give me the opportunity to submit relevant information, and that he would conduct a grievance resolution meeting with me and Dr. Suzuki (or Dr. Vollmer, my Chairman). However, when a meeting (the only one I have been able to discover) was held, I was not invited to it, was not told it was going to take place, and was not given the opportunity to submit information.

11. In November 1992, Alvin told Vollmer that he was worried that the TAFC committee was not acting on his case. Vollmer told him that Tobias had confidentially contacted Vollmer, and that Vollmer was not sure if the panel would be meeting with him. Vollmer told Alvin that UPitt attorneys were on the case.

12. On December 22, 1992, Tobias and Golin wrote to Alvin on behalf of the TAFC, informing him that they had rejected his claim, and that he could pursue an appeal by following the second, formal step laid out in the Faculty Handbook.

Alvin admits that after this series of correspondence, he did not pursue any further review by any faculty committee. The record also reflects that he failed to present evidence suggesting that he ever attempted to trigger a grievance process regarding his allegations (1) that he was denied secretarial support; (2) that he was treated unfairly in connection with his grant proposal; (3) that his 1993-94 or 1994-95 annual review was biased; and (4) that his transfer from the School of Dental Medicine to the School of Pharmacy was improper.

C. The Conflict of Interest Claim

Alvin separately alleges that he was deprived procedural due process when the University refused to respond to his

9

complaints that Suzuki had unfairly ordered him to stop all research projects. The evidence regarding this claim establishes that Alvin filled out forms entitled"Conflict of Interest Disclosure Statements," which are intended to reveal any conflicts a faculty member may have in their research. On May 17, 1995, Suzuki wrote to Alvin, stating that he would not approve Alvin's conflict of interest statements. He wrote that there was an apparent conflict of interest because of Alvin's involvement with PKI (but did not detail its nature) and wrote that it was Alvin's burden to prove that his PKI activities did not create a conflict with his obligations to the University. He directed Alvin to "not participate in any research or project without the express written approval of Dr. Paul Moore, Director of Research, who shall certify that he has examined the proposed activity [to] determine whether there is in fact any conflict of interest between the University and your interests in Pharmakon." Suzuki also informed Alvin that he could appeal the decision.

Alvin then wrote to the Provost, Dr. James Maher, to complain. The record reflects that, during 1995, Maher and Alvin corresponded frequently regarding these claims. Maher told Alvin that a Conflict of Interest Committee had been established to review Suzuki's decision. In October 1995, the Vice Provost wrote Alvin that he could supply additional information, and that he should write to the committee stating his position. Alvin responded that he could not state his position fully without knowing what Suzuki had said, and that he had no faith in the University process. On November 29, 1995, the Vice Provost wrote to Alvin explaining Suzuki's justification, and stating that "I hope that this information has been helpful to you and that we will be able to begin deliberations to have a recommendation to the Provost in short order."

On February 15, 1996, Alvin wrote the Provost, stating that

> [m]atters pertaining to the conflict of interest issues which have been raised about me within the University of Pittsburgh are involved in my pending litigation against the University and others. I believe that it is necessary and appropriate to follow the litigation path,

10

in part because of my inability to obtain full, fair and
due process within the University.

He added that given his experience with UPitt, he was left
with "no choice but to continue to attempt to protect myself
and obtain my legitimate rights through the court action."

D. The Transfer of Tenure

In 1987, UPitt developed a plan to transfer the entire
pharmacology faculty to UPitt's School of Dental Medicine,
leaving SPharm intact, but without faculty. According to
University records, on July 1, 1987, Alvin's tenure and
primary appointment in SPharm was terminated and
transferred to the Department of Pharmacology of the
School of Dental Medicine ("SDM"). On September 2, UPitt
wrote to Alvin, informing him that he had been, or would be
(the letter is ambiguous) transferred from SPharm to the
position of tenured Associate Professor of Physiology and
Pharmacology in the SDM, and asking for his approval.
Alvin did not sign this letter as requested, or otherwise
approve of or consent to the transfer. All other members of
the pharmacology faculty agreed to the transfer.

II. Procedural History

Alvin and PKI filed suit against CLSI, UPitt, and UPMC in
the Court of Common Pleas of Allegheny County,
Pennsylvania. Alvin sued under 42 U.S.C. S 1983 and
Pennsylvania state law. The original complaint by PKI
included claims for unfair competition, violation of the
Lanham Act, 15 U.S.C. S 1125, and civil conspiracy. The
defendants removed to the District Court for the Western
District of Pennsylvania.

The defendants moved to dismiss PKI's claim on the
ground that PKI was not a real party in interest. They
contended that PKI was essentially suing as a partner of
PRD, but lacked standing to do so. This argument
persuaded the District Court, which, in a hearing on
August 15, dismissed (without prejudice) all claims
concerning PKI because it concluded that PKI was "not a
proper party . . . under the allegations that have been

11

made" in the original complaint. The court stated to Appellant's Counsel: "You can amend your complaint . . . . But not substitute a party without leave of court." The court made clear it was open only to an amendment that explained the specific harm suffered by PKI, stating that there "is going to be no amended complaint as to Dr. Alvin's complaint." However, the written order that followed stated "[t]he motion of defendants to dismiss the claims asserted by plaintiff . . . (PKI) is granted without prejudice to the right of plaintiffs, John D. Alvin and Pharmakon, Inc., to file an amended complaint." PKI and Alvin represent that the court's pronouncements led them to believe that they could amend their complaint in more ways than one, and they did so.

Alvin and PKI filed an amended complaint which detailed how PKI had been separately harmed, and which joined PRD as a new plaintiff. UPitt moved for dismissal, or in the alternative, to strike the amended complaint. Alvin and PKI then moved for leave to amend the complaint (in the form of the amended complaint previously filed), and for leave to join PRD as a party. On November 12, the District Court granted the motion to strike the Amended Complaint, dismissed PKI's original claims with prejudice, and denied the Motion to Amend and to join PRD. When counsel inquired as to whether PKI's amended complaint was legally adequate, the District Court announced "I'm not making any ruling; [the plaintiffs] did not comply with my order. The complaint added a party. I didn't give leave to add a party. I'm striking that amended complaint in its entirety . . . [f]or that reason."

The District Court then granted summary judgment for Suzuki on Alvin's S 1983 claims, concluding even if all he alleged were true, he would not have been deprived of a property interest. The court also dismissed the state claims without prejudice. This appeal followed, in which the plaintiffs challenge the District Court's ruling on Alvin's S 1983 claims, the refusal to grant leave to amend the PKI complaint and add PRD, and the resulting dismissal. We have jurisdiction under 28 U.S.C. S 1291.

12

III. The Procedural Due Process Claims

The Fourteenth Amendment of the Constitution forbids a state from depriving persons of life, liberty, or property without due process of law. U.S. Const. amend. XIV,S 1. UPitt is a state actor. See Braden v. University of Pittsburgh, 552 F.2d 948, 955-65 (3d Cir. 1977) (en banc). When a plaintiff sues under 42 U.S.C. S 1983 for a state actor's failure to provide procedural due process, we employ the "familiar two-stage analysis," Robb v. City of Philadelphia, 733 F.2d 286, 292 (3d Cir. 1984), inquiring (1) whether "the asserted individual interests are encompassed within the fourteenth amendment's protection of `life, liberty, or property' "; and (2) whether the procedures available provided the plaintiff with "due process of law."

A. Failure to Follow Processes

In order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate."[A] state cannot be held to have violated due process requirements when it has made procedural protection available and the plaintiff has simply refused to avail himself of them." Dusanek v. Hannon, 677 F.2d 538, 543 (7th Cir. 1982); see also Bohn v. County of Dakota, 772 F.2d 1433, 1441 (8th Cir. 1985). A due process violation "is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process." Zinermon v. Burch, 494 U.S. 113, 126 (1990). If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants. See McDaniels v. Flick , 59 F.3d 446, 460 (3d Cir. 1995); Dwyer v. Regan, 777 F.2d 825, 834-35 (2d Cir. 1985), modified on other grounds, 793 F.2d 457 (2d Cir. 1986); Riggins v. Board of Regents , 790 F.2d 707, 711-12 (8th Cir. 1986).

This requirement is to be distinguished from exhaustion requirements that exist in other contexts. Alvin appears to conflate the two, and contends, as an alternative to his claim that he attempted to use the available procedures,

13

that he need not go through the processes available because of the general rule there is no exhaustion requirement for 42 U.S.C. S 1983 claims. See Patsy v. Board of Regents of Florida, 457 U.S. 496, 516 (1982); Hohe v. Casey, 956 F.2d 399, 408 (3d Cir. 1992). However, exhaustion simpliciter is analytically distinct from the requirement that the harm alleged has occurred. Under the jurisprudence, a procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies. See Zinermon, 494 U.S. at 126. Applying these principles to this case, we conclude that, viewing the facts in the light most favorable to Alvin, he did not avail himself of the procedures provided by the University because he did not follow the University regulations regarding the use of the grievance procedure.

Alvin contends that he triggered the first (informal) step in the grievance procedure by his early letters, and the formal step by his written grievance. According to Alvin, the informal process was triggered by his first meeting with Dr. Golin in 1991 (item #31), over a year prior to any review on the part of the University. The problem with this contention is that Golin was not the chair of the TAFC, which is the party an aggrieved faculty member is supposed to contact according to the faculty handbook. See supra Section I.B. Alvin first contacted Tobias, who was the chair of the TAFC, in October 1992 (item #10). After meeting Tobias, the TAFC met and discussed the case, and Alvin learned of the results of this informal proceeding in December 1992 (item #12). This two-month delay is much greater than the two-week time period set forth in the handbook as the time period within which the informal process is supposed to take. The handbook does not promise a two-week turnaround; rather, it merely states that "every effort will be made" to satisfactorily resolve the dispute within two weeks. Alvin complained about the inordinate delay, but he never actually triggered the formal process by submitting a formal grievance letter to the Provost.

_____

1. We refer in this and the next two paragraphs to the itemization in supra Section I.B.

14

Alvin's 1991 letter to Provost Henderson (item #4) was informal, and did not refer to the Faculty Grievance Procedure. But even if that letter were intended to trigger the formal procedures, the Provost cannot be expected to have guessed at its purpose. Alvin's two letters to Dr. Koch (items #1 & 2), while plaintive, do not purport to be grievances, but rather constitute efforts to learn about the grievance procedure, and both were sent prior to his initial contact with Golin. The letter to Suzuki (item #5) and the letter to his Department Chair, Dr. Volmer (item #6), are both clearly outside the process laid out in the Handbook.

Alvin's strongest argument derives from the letters to Chancellor O'Connor (item #8) and Dr. Holland, University Senate President (item #9). In both letters, arguably after a futile effort to trigger the informal process (his alleged conversation with Golin), Alvin laid out his complaint; the latter letter included a statement that he was "formally submitting" his grievance, and was accompanied by a formal grievance. But these letters were sent to the wrong officials in the University. The President of the University Senate is not the Provost. Furthermore, the letter to Holland did not state that Alvin had attempted to use the informal process. Though these may seem like minor mistakes, the burden is on the aggrieved faculty member to make the complaint in the right manner to the right individual before he can claim that the process has failed him.

Dr. Holland took the letter to be a request for initiation of the informal processes (there was no suggestion in the letter that Alvin had therefore attempted to use the informal process), and shortly thereafter, the informal process began. After the TAFC rejected Alvin's claims, Alvin was informed by the December 22 letter that he could pursue the formal process (item #12). When asked during a deposition, Alvin admitted that he did not trigger the formal process after December 22:

> Q: At any time after December 22, 1992, did you file a formal complaint with the Provost under the Second Step Formal Process arising out of the matters discussed in this December 22 letter?

15

A: Not after this letter.

Q: Why not?

A: I had already done it . . . .

(1378). He goes on to detail his previous efforts to engage his department and the Provost's office. While we are not unsympathetic to Alvin's apparent misunderstanding of the terms of the faculty grievance handbook, our sentiments do not change the requirement that one use the procedures available, which Alvin did not do.

In sum, Alvin simply did not follow the prescribed processes in the Faculty Handbook. His battery of letters to the right people in the wrong manner, and the wrong people in the right manner, does not allow him to sustain a claim that the procedures he did not use were constitutionally flawed.[2] Alvin may understandably have felt that he did all that he could, and that any other efforts would be useless. In fact, although he wrote far more than he needed to in one sense, he ultimately wrote one letter too little (and too late). If Alvin had (1) attempted to use the informal process and then (2) after a few weeks had passed without any result on the informal process, written a formal grievance to the Provost, stating that the informal process had failed, he could state a claim (presuming that the process failed even after this effort). But even reading the record in the light most favorable to Alvin, there is simply insufficient evidence supporting his claim that he followed through and triggered the second, formal step of the procedure on any of the claims.[3]

_____

2. In his supplemental brief requested by this panel, Alvin also suggests that he did not have to use these procedures, noting that Dr. Detre, Senior Vice Chancellor, testified that the correct appeals process is "[d]epartmental chairman to the dean, from the dean to me, from me to the provost, from the provost to the chancellor of the University." However, Alvin never suggested that he did not need to use the channels provided in the Faculty Handbook prior to the supplemental briefs to the panel after oral argument. Therefore, this argument is waived. See Harris v. City of Philadelphia, 35 F.3d 840, 845 (3d Cir. 1994) (holding that issues raised for the first time on appeal will not be considered).
3. We also note that Alvin has not framed this case in the context of cases involving inordinate delay, and neither party briefed those cases nor discussed their framework at oral argument. Cf. FDIC v. Mallen, 486 U.S. 230, 242 (1988) (setting forth the framework for delay claims).

16

B. Futility

In the alternative, Alvin argues that he did not need to trigger the formal process correctly, because it was clear that it would be constitutionally inadequate, in that the University would be entirely unresponsive. He does not dispute that if the University followed its own regulations, it would provide him constitutionally adequate process. Rather, Alvin contends that regardless of the procedures laid out in the handbook, his experience with the University demonstrated that it was intransigent, and that it never intended to fairly consider his complaints. Hence, he argues, using the processes would have been futile.

When access to procedure is absolutely blocked or there is evidence that the procedures are a sham, the plaintiff need not pursue them to state a due process claim. See Stauffer v. William Penn Sch. Dist., 829 F. Supp. 742, 749 (E.D.Pa. 1993); Moran v. Burns, No. 92-1765, 1993 U.S. Dist. LEXIS 10365, *13 (D.N.J. July 26, 1993) (recognizing that a plaintiff could present evidence of futility); see also W. v. Tirozzi, 832 F.2d 748, 756 (3d Cir. 1987) (discussing similar requirements when seeking injunctive relief under S 1983 and IDEA). However, since Alvin never invoked the second part of the processes available to him, which appear facially adequate, we will not hold that this step would have been unavailing (in procedure, if not in substance), absent concrete evidence supporting such a contention.

We have previously encountered like cases, in which plaintiffs have attempted to make a procedural due process claim, charging that bias has infected a review of its deprivation, although they have not used all the procedures available to them. For example, in McDaniels v. Flick, 59 F.3d 446, 460 (3d Cir. 1995), we stated that

> a discharged employee cannot claim in federal court
> that he has been denied due process because his
> pretermination hearing was held by a biased individual
> where he has not taken advantage of his right to a
> post-deprivation hearing before an impartial tribunal
> that can rectify any possible wrong committed by the
> initial decisionmaker.

17

Likewise, in Dykes v. Southeastern Pennsylvania Transportation Authority, 68 F.3d 1564 (3d Cir. 1995), we held that a dismissed employee failed to state a claim for a due process violation after pursuing a three-level, apparently biased, grievance procedure, when he did not request arbitration, although arbitration was available to him. We concluded that his failure to pursue the arbitration available to him precluded his bringing a due process challenge even when the "plaintiff allege[d] that the defendants acted in concert to deprive him both of a meaningful hearing and of arbitration" because the "administrative process in place ha[d] incorporated safeguards adequate to resolve these allegations in a manner consistent with the demands of due process." Id. at 1572. Likewise, in this case, if Alvin failed to use the post-deprivation procedures available to him, he cannot forego attempting to use those processes simply because he thinks that they will be followed in a biased manner.

Viewing the facts in the light most favorable to Alvin, there is simply insufficient evidence that the formal hearing would not be held in a fair and impartial manner. For example, he has not brought forth evidence that he would not be able to use a lawyer, present evidence, or explain himself. The record supports his argument that the informal proceedings were painfully slow, and that several letters he wrote were not responded to, and even that several members of the UPitt faculty and administration were disposed against his claim. But as in Dykes , 68 F.3d at 1572, an allegation that initial stages of a process had been biased does not mean that the later processes will be biased as well. In McDaniels, 59 F.3d at 460, we observed that "[u]sually, an employment termination decision is made initially by the employee's direct supervisor or someone working in the same organization as the employee," and that individuals in such a position may well be influenced, or be alleged to be influenced, by "bias or improper motivation." Regardless, we held that such claims of bias do not give an employee license to conclude that the entire system is biased. See id.

Therefore, while the fired professor in McDaniels wanted to prove that his pre-termination hearing was not impartial,

18

the presence of arbitration and other apparently adequate post-termination remedies foreclosed his ability to make a procedural due process claim. See id. at 460-61. The Constitution does not require perfection at every stage of a process; like the plaintiff in McDaniels, Alvin has not used all the processes available, and he cannot convert his difficulties with quickly triggering the informal process into a contention that the entire process, which he has not yet used, is biased. See id.

C. The Conflict of Interest Claim

Alvin also makes a distinct claim based on the alleged inadequacy of the process available to Alvin when Suzuki ordered him to stop all research on the ground that there was an apparent conflict between Alvin's commitments to PKI and the University. A review of the evidence reveals that this claim also fails due to Alvin's failure to complete the processes provided by the University.

Alvin's correspondence with Maher in late 1995 and early 1996 demonstrates that, contrary to Alvin's contentions, Maher was fairly responsive. While he did not give Alvin what he wanted, he engaged him and his concerns and triggered a review process. Moreover, Alvin's contention that by the end of 1995 the Provost's Office had simply stopped dealing with him is not supported. Rather, Alvin was indisputedly the party that ended the process when he precipitously wrote to Maher, informing him that he would be pursuing his complaints through litigation. There is no other way to read this letter. Furthermore, Alvin did not even attempt to pursue an appeal of the conflict of interest decision (or refusal to decide, as he characterizes it) through the grievance process provided in the Faculty Handbook. Therefore, even if we were to accept his argument that the Provost's office had failed him through direct review of Suzuki's decision, he was obligated to trigger the formal process before bringing this claim. See Dykes, 68 F.3d at 1571 (holding that failure of lower levels of process do not justify skipping secondary levels before filing a federal action).4

_____

4. We do not hold that a party need wait forever before suing, but only that, if the process is moving forward, and the avenues of internal appeal have not been triggered, then a suit claiming inadequacy of procedural protection is premature.

D. Other Claims

Alvin admittedly did not attempt to use the informal process for his other claims: (1) that he was denied secretarial support; (2) that he was treated unfairly in connection with his grant proposal; (3) that his 1993-94 or 1994-95 annual review was biased; and (4) that his tenure was transferred from the School of Dental Medicine to the School of Pharmacy (a claim we consider separately, see Part IV, infra). He asserts that his experience had taught him that the grievance process was a sham, and that in such a circumstance, one need not go through a futile exercise in order to state a due process claim. However, as discussed above, he presents no evidence that the procedures are inadequate, and, for the reasons explained above, see Section III.A-C, supra, he cannot state a procedural due process claim with respect to these aspects of the case absent such evidence.

IV. Pre-termination Claim Regarding Tenure Transfer

Alvin's last claim is that he was denied constitutionally mandated notice and a hearing before his transfer of tenure from SPharm to the School of Dental Medicine. This is distinct from his other claims, in which his quarrel with the University concerns the adequacy of their post -termination procedures.

A.

Alvin submits that he did not receive any notice or hearing prior to being transferred, and the Constitution requires that he have these pre-deprivation procedures.5 Unlike the other claims, a complete constitutional violation has (allegedly) already occurred; if the Constitution requires pre-termination procedures, the most thorough and fair post-termination hearing cannot undo the failure to provide such procedures. See Stana v. School Dist. of Pittsburgh, 775 F.2d 122, 129 (3d Cir. 1985) (indicating that following

_____

5. We need not, and do not, decide whether there is a disputed issue of material fact regarding whether Alvin received notice because we conclude that even if he did not, notice was not required.

20

Cleveland Board of Education v. Loudermill, 470 U.S. 532 (1985), there can be no requirement to pursue post-deprivation remedies when pre-deprivation notice or hearing is required for due process). To determine whether and what sort of pre-deprivation hearing is required, we examine, and balance, three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest.

Mathews v. Eldridge, 424 U.S. 319, 335 (1976). While, under this test, a public employee is generally entitled to notice and an opportunity to be heard prior to being deprived of his or her property interest in employment, see, e.g., McDaniels v. Flick, 59 F.3d 446, 456 (3d Cir. 1995), this rule is not absolute, see Gilbert v. Homar , 520 U.S. 924, 929 (1997). The pre-termination hearing must be examined in light of the "the last factor in the Mathews balancing . . . the risk of erroneous deprivation and the likely value of any additional procedures." Id. at 933. In Codd v. Velgar, 429 U.S. 624 (1977), the Court concluded that a pre-termination hearing was not required when there was no underlying factual dispute to be hashed out in the hearing: "[I]f the hearing mandated by the Due Process Clause is to serve any useful purpose, there must be some factual dispute between an employer and a discharged employee which has some significant bearing on the employee's reputation." Id. at 627-28 (emphasis added). As in Codd, there was simply no factual dispute that a pre-deprivation notice or hearing could have addressed. Alvin's transfer was as part of a large and undifferentiated group-- all the SPharm faculty were transferred--and there were no factual disputes that could have been resolved at a hearing.

Even Alvin's letters and complaint acknowledge that the argument about the transfer is an argument about University-wide policy--not a disagreement about accusations against Alvin. Therefore, the "risk of error," as it were, was nonexistent. In sum, while Alvin may be able to make out a breach of contract claim for the transfer, we

21

find that the absence of pre-deprivation notice or a hearing did not, in itself, violate his due process rights.

V. PKI and PRD's Claims

Leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15. Although refusals to grant leave to amend are reviewed for abuse of discretion, see Rolo v. City Investing Co. Liquidating Trust, 155 F.3d 644, 654 (3d Cir. 1998), it is an abuse of discretion to deny leave to amend unless "plaintiff 's delay in seeking amendment is undue, made in bad faith, prejudicial to the opposing party, or [the amendment] fails to cure the jurisdictional defect," Berkshire Fashions, Inc. v. M.V. Hakusan II, 954 F.2d 874, 886 (3d Cir. 1992); see also Foman v. Davis, 371 U.S. 178, 182 (1962) (holding that it is abuse of discretion to deny leave to amend absent a clear or declared reason such as delay, bad faith, prejudice, or a repeated failure to cure a problem in the complaint); Boileau v. Bethlehem Steel Corp., 730 F.2d 929, 938 (3d Cir. 1984) (trial court abused discretion by refusing to permit plaintiff to amend complaint where no prejudice to defendant was alleged or proved). Leave to amend may be denied, however, if amendment would be futile. See Smith v. NCAA, 139 F.3d 180, 190 (3d Cir. 1998), rev'd on other grounds , 525 U.S. 459 (1999). An amendment is futile if the amended complaint would not survive a motion to dismiss for failure to state a claim upon which relief could be granted. See id.

The plaintiffs contend: (1) that the District Court should have granted leave to amend PKI's complaint to clarify the basis of its claim that it had been independently harmed; and (2) that the court should have allowed PRD to be added as a party. We agree. There was no evidence of bad faith, delay, or prejudice, or any other reasons justifying the denial of leave to amend. In fact the court did not justify its denial of leave to amend for any of those reasons, but because the plaintiff 's amended complaint did not comport with the court's prior order about the scope of amendment. The court stated: "The amended complaint clearly fails to comply with the requirements I gave on August 15th at the time we had our last argument in this case. I'm going to grant the motion to strike the amended complaint," and

22

"you failed to follow the instructions that I gave on August 15." When the plaintiffs objected, both to the refusal to allow amendment and the court's response, noting that a dismissal with prejudice would interfere with PKI's rights (given the statute of limitations), the court responded, not in Rule 15 terms, but in something more like Rule 16(b) terms,[6] that it would be "easier to manage from the Court's point of view. We're not going to permit any further amendment to this complaint."

As this excerpt makes clear, the record supports PKI's theory that the District Court refused the amendment because of case management concerns, both in terms of the course the case might follow, and a perceived need for fidelity to the court's prior management plan, which did not contemplate adding PRD as a party (and arguably included a clear order not to do so). But these reasons are not among those justifying a refusal of leave to amend. Moreover, PKI was dismissed with prejudice, which is a severe and disfavored remedy. See, e.g., Icon Group, Inc. v. Mahogony Run Dev. Corp., 829 F.2d 473, 477 (3d Cir. 1987) (holding that dismissal of a claim after the plaintiff made a good faith, but unsuccessful, effort to comply with an order to amend was inappropriate); Donnelly v. Johns–Manville Sales Corp., 677 F.2d 339, 342 (3d Cir. 1982). Cf. Estate of Leon Spear v. Commissioner of IRS, 41 F.3d 103, 111 (3d Cir. 1994) ("We apply a sliding scale––the harsher the sanction being imposed, the more the balance will have to be against the party being sanctioned to justify the sanction.").

The defendants argue that PKI's dismissal should be upheld because the unfair competition claims could only have affected PRD, and hence PKI cannot be the real party in interest. Essentially, they are invoking the rule that, if amendment would be futile, the court does not abuse its discretion in denying leave to amend. See Smith , 139 F.3d at 190. PKI, the defendants submit, was filing not on its own behalf, but as a limited partner of PRD. Under

_____

6. We refer to Federal Rule of Civil Procedure 16(b), which sets forth the District Court's general case management power, establishing time limits for filing motions, making amendments, and joining parties, inter alia.

23

Pennsylvania law, a limited partner loses the right to conduct business in exchange for limited liability, and may not sue for harms to the partnership. See In re Estate of Hall, 535 A.2d 47, 56 (Pa. 1987); Kenworthy v. Hargrove, 855 F. Supp. 101, 104 (E.D. Pa. 1994). Alvin himself has admitted that PKI had not engaged in business activity for some time (it has not employed anyone since 1995), and that all the lab employees work for PRD. This is in contrast to PRD, which regularly engages in business.

However, the plaintiffs contend that the harm to PKI occurred prior to the creation of PRD, and in fact led to the creation of PRD. In particular, they allege that unfair competition led PKI to make arrangements with CPF and PRD; that the sale and marketing of PKI's technical products was diminished; and that it could not engage in its former operations. The proposed amended complaint stated that PKI had engaged in independent business through 1991, and continued to operate independently of PRD to the date of the complaint. Regardless of the substantive validity of the claims, PKI has at least alleged sufficient facts that would render it a real party in interest.

This leads to the question whether PKI has stated a claim that could survive a 12(b)(6) motion. See Smith , 139 F.3d at 190. This is a legitimate question, and if the court had made a legally correct determination that PKI has not stated a viable claim, we would uphold its decision to refuse to allow PKI to amend its complaint. However, nothing in the record suggests that the court even considered whether PKI stated a viable claim by way of its amended allegations, and the parties, on appeal, merely argue about whether PKI is a real party in interest. Therefore, because PKI's proposed amended complaint colorably alleges specific harm to it, we conclude that the court abused its discretion when it dismissed PKI's claims with prejudice. Likewise, the District Court abused its discretion in denying the motion to amend the complaint to add PRD. There was no evidence of bad faith, delay or prejudice, and there is no indication in the record that the District Court even considered whether the addition would be futile. Rather, the record supports PRD's theory that the court refused to allow that amendment too for case management purposes.

24

For the foregoing reasons, the judgment of the District Court dismissing PKI, refusing to allow an amendment of the complaint, and refusing to allow an amendment adding PRD as a party will be vacated, and the claims remanded to the District Court for further proceedings. The court can consider the PRD and PKI claims on remand.

VI.

In sum, we will affirm the District Court's grant of summary judgment for the defendants on Alvin's claims and the dismissal, without prejudice, of his accompanying state law claims.7 We will also reverse the dismissal, with prejudice, of the PKI claims, and the refusal to amend the complaint to add PRD, and will remand the case to the District Court for further proceedings regarding those claims. Parties to bear their own costs.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit
_____

7. Alvin also claims that he was deprived of a liberty interest without due
process of law. We affirm the District Court's disposal of this claim for the reasons set forth in the District Court's opinion.

25