# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued May 5, 2014          Decided July 15, 2014

No. 13-5315

RALLS CORPORATION,
APPELLANT

v.

COMMITTEE ON FOREIGN INVESTMENT IN THE UNITED STATES,
ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:12-cv-01513)

*Paul D. Clement* argued the cause for the appellant. *Viet D. Dinh*, *H. Christopher Bartolomucci* and *George W. Hicks*, *Jr.*, were on brief.

*Douglas N. Letter*, Attorney, United States Department of Justice, argued the cause for the appellees. *Stuart F. Delery*, Assistant Attorney General, *Ronald C. Machen*, *Jr.*, United States Attorney, and *Sonia K. McNeil*, Attorney, were on brief.

Before: HENDERSON, BROWN and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LeCRAFT HENDERSON, *Circuit Judge*: In March 2012, Appellant Ralls Corporation (Ralls) purchased four American limited liability companies (Project Companies) previously formed to develop windfarms in north-central Oregon. The transaction quickly came under scrutiny from the Committee on Foreign Investment in the United States (CFIUS), an Executive Branch committee created by the Defense Production Act of 1950 (DPA), codified as amended at 50 U.S.C. app. § 2170, and chaired by the Secretary of the U.S. Treasury Department (Treasury Secretary), *see* 50 U.S.C. app. § 2170(k). Pursuant to section 721 of the DPA, CFIUS reviews any transaction "which could result in foreign control of any person engaged in interstate commerce in the United States." *Id.* § 2170(a)(3). Although Ralls is an American corporation, the transaction fell within the ambit of the DPA because both of Ralls's owners are Chinese nationals. CFIUS determined that Ralls's acquisition of the Project Companies threatened national security and issued temporary mitigation orders restricting Ralls's access to, and preventing further construction at, the Project Companies' windfarm sites. The matter was then submitted to the President, who also concluded that the transaction posed a threat to national security. He issued a permanent order (Presidential Order) that prohibited the transaction and required Ralls to divest itself of the Project Companies. Ralls challenged the final order issued by CFIUS (CFIUS Order) and the Presidential Order in district court, alleging, *inter alia*, that the orders violate the Due Process Clause of the Fifth Amendment to the United States Constitution because neither CFIUS nor the President (collectively, with Treasury Secretary and CFIUS Chairman Jacob Lew, Appellees) provided Ralls the opportunity to review and rebut the evidence upon which they relied. The district court dismissed Ralls's CFIUS Order claims as moot and its due process challenge to the Presidential Order for

failure to state a claim. For the reasons set forth below, we reverse.

## I. BACKGROUND

### A. STATUTORY AND REGULATORY FRAMEWORK

This case involves Executive Branch review of a business transaction under section 721 of the DPA, also known as the "Exon-Florio Amendment."[1] As amended, section 721 of the DPA directs "the President, acting through [CFIUS]," to review a "covered transaction to determine the effects of the transaction on the national security of the United States." 50 U.S.C. app. § 2170(b)(1)(A). Section 721 defines a covered transaction as "any merger, acquisition, or takeover . . . , by or with any foreign person which could result in foreign control of any person engaged in interstate commerce in the United States." *Id.* § 2170(a)(3).

Review of covered transactions under section 721 begins with CFIUS. As noted, CFIUS is chaired by the Treasury Secretary and its members include the heads of various federal agencies and other high-ranking Government officials with foreign policy, national security and economic responsibilities.[2] *See id.* § 2170(k)(2), (3). CFIUS review is

---

[1] The name comes from its co-sponsors, former Senator James Exon (D-Neb.) and former Representative James Florio (D-N.J.).

[2] CFIUS includes the Secretaries of Treasury, Homeland Security, Commerce, Defense, State and Energy; the Secretary of Labor and the Director of National Intelligence, who participate as non-voting, *ex officio* members; the United States Attorney General; and other officials as the President deems appropriate. 50 U.S.C. app. § 2170(k)(2). The President also appointed the United States Trade Representative and the Director of the Office of Science and Technology Policy to CFIUS and directed several White House

4

initiated in one of two ways. First, any party to a covered transaction may initiate review, either before or after the transaction is completed, by submitting a written notice to the CFIUS chairman. *See id.* § 2170(b)(1)(C)(i); 31 C.F.R. § 800.401(a) ("A party or parties to a *proposed or completed* transaction *may* file a voluntary notice of the transaction with the Committee." (emphases added)); *id.* § 800.402(c)(1)(vii) (voluntary notice must include "expected date for completion of the transaction, or the date it was completed"); *id.* § 800.224 ("The term transaction means a proposed or completed merger, acquisition, or takeover."). [3] Alternatively, CFIUS may initiate review *sua sponte*. *See* 50 U.S.C. app. § 2170(b)(1)(D). The CFIUS review period lasts thirty days, during which CFIUS considers the eleven factors set forth in 50 U.S.C. app. § 2170(f) to assess the transaction's effect on national security.[4] *See id.* § 2170(b)(1)(A)(ii), (E).

officials, among others, to participate as observers. *See* Exec. Order No. 13,456, § 3(b), (c), 73 Fed. Reg. 4677, 4677 (2008).

[3] The DPA directs the President to "direct . . . the issuance of regulations to carry out this section." 50 U.S.C. app. § 2170(h)(1), which duty the President delegated to the Treasury Secretary. Exec. Order 13,456, § 4.1(b), 73 Fed. Reg. at 4678.

[4] The eleven factors include "(1) domestic production needed for projected national defense requirements, (2) the capability and capacity of domestic industries to meet national defense requirements, including the availability of human resources, products, technology, materials, and other supplies and services, (3) the control of domestic industries and commercial activity by foreign citizens as it affects the capability and capacity of the United States to meet the requirements of national security, (4) the potential effects of the proposed or pending transaction on sales of military goods, equipment, or technology to [certain] countr[ies] . . . (5) the potential effects of the proposed or pending transaction on United States international technological leadership in areas affecting United

5

During its review, if CFIUS determines that "the transaction threatens to impair the national security of the United States and that threat has not been mitigated," it must "immediately conduct an investigation of the effects of [the] covered transaction on the national security . . . and take any necessary actions in connection with the transaction to protect the national security." *Id.* § 2170(b)(2)(A), (B). CFIUS is given express authority to "negotiate, enter into or impose, and enforce any agreement or condition with any party to the covered transaction in order to mitigate any threat to the national security of the United States that arises as a result of the covered transaction." *Id.* § 2170(*l*)(1)(A). The investigation period lasts no more than forty-five days. *See id.* § 2170(b)(2)(C). If CFIUS determines at the end of an investigation that the national security effects of the transaction have been mitigated and that the transaction need not be prohibited, action under section 721 terminates and CFIUS submits a final investigation report to the Congress. *See id.* § 2170(b)(3)(B); 31 C.F.R. § 800.506(d).

---

States national security; (6) the potential national security-related effects on United States critical infrastructure, including major energy assets; (7) the potential national security-related effects on United States critical technologies; (8) whether the covered transaction is a foreign government-controlled transaction, as determined under subsection (b)(1)(B) of this section; (9) as appropriate, and particularly with respect to transactions requiring an investigation under subsection (b)(1)(B) of this section, a review of the current assessment of [the foreign country's relationship and cooperation with the United States]; (10) the long-term projection of United States requirements for sources of energy and other critical resources and material; and (11) such other factors as the President or [CFIUS] may determine to be appropriate, generally or in connection with a specific review or investigation." 50 U.S.C. app. § 2170(f).

If CFIUS concludes at the end of its investigation that a covered transaction should be suspended or prohibited, it must "send a report to the President requesting the President's decision," which report includes, *inter alia*, information regarding the transaction's effect on national security and CFIUS's recommendation. 31 C.F.R. § 800.506(b), (c). Once CFIUS's report is submitted to the President, he has fifteen days to "take such action for such time as the President considers appropriate to suspend or prohibit any covered transaction that threatens to impair the national security of the United States." 50 U.S.C. app. § 2170(d)(1), (2). The President may exercise his authority under section 721 only if he finds that

> there is credible evidence that leads [him] to believe that the foreign interest exercising control might take action that threatens to impair the national security; and . . . provisions of law, other than [section 721] and the International Emergency Economic Powers Act, do not, in the judgment of the President, provide adequate and appropriate authority for the President to protect the national security in the matter before the President.

*Id.* § 2170(d)(4). Significantly, the statute provides that "[t]he actions of the President under paragraph (1) of subsection (d) of this section and the findings of the President under paragraph (4) of subsection (d) of this section shall not be subject to judicial review." *Id.* § 2170(e). In deciding whether to suspend or prohibit a transaction, the President is directed to consider, "among other factors[,] each of the factors described in subsection (f) of this section, as appropriate." *Id.* § 2170(d)(5); *see supra* note 4.

7

## B. FACTUAL BACKGROUND

Ralls is an American company incorporated in Delaware with its principal place of business in Georgia. Ralls is owned by two Chinese nationals, Dawei Duan and Jialiang Wu. Duan is the chief financial officer of Sany Group (Sany), a Chinese manufacturing company, and, at the time of the transaction at issue, Wu was a Sany vice-president and the general manager of Sany Electric Company, Ltd. (Sany Electric). Ralls's amended complaint asserts that "Ralls is in the business of identifying U.S. opportunities for the construction of windfarms in which the wind turbines of Sany Electric, its affiliate, can be used and their quality and reliability demonstrated to the U.S. wind industry in comparison to competitor products." Am. Compl. ¶ 5, *Ralls Corp. v. Comm. on Foreign Inv. in the U.S.*, No. 1:12-cv-01513 (D.D.C. Oct. 1, 2012).

In March 2012, Ralls purchased the Project Companies, which are four American-owned, limited liability companies: Pine City Windfarm, LLC; Mule Hollow Windfarm, LLC; High Plateau Windfarm, LLC; and Lower Ridge Windfarm, LLC.[5] The Project Companies were originally created by an Oregon entity (Oregon Windfarms, LLC) owned by American citizens to develop four windfarms in north-central Oregon (collectively, Butter Creek projects). Before Ralls acquired

---

[5] Ralls's acquisition of the Project Companies resulted from a series of transactions. In 2010, Oregon Windfarms, LLC, sold its interest in the Project Companies to Terna Energy USA Holding Corporation (Terna), a Delaware corporation owned by a publicly traded Greek company. In 2012, Terna sold the Project Companies to Intelligent Wind Energy, LLC (IWE), a Delaware company owned by U.S. Innovative Renewable Energy, LLC (USIRE). USIRE sold IWE to Ralls.

them, each of the Project Companies had acquired assets necessary for windfarm development, including

> easements with local landowners to access their property and construct windfarm turbines; power purchase agreements with the local utility, PacifiCorp; generator interconnection agreements permitting connection to PacifiCorp's grid; transmission interconnection agreements and agreements for the management and use of shared facilities with other nearby windfarms; and necessary government permits and approvals to construct five windfarm turbines at specific, approved locations.

Am. Compl. ¶ 37.

The Butter Creek project sites are located in and around the eastern region of a restricted airspace and bombing zone maintained by the United States Navy (Navy). Three of the windfarm sites are located within seven miles of the restricted airspace while the fourth—Lower Ridge—is located within the restricted airspace. After the Navy urged Ralls to move the Lower Ridge site "to reduce airspace conflicts between the Lower Ridge wind turbines and low-level military aircraft training," Am. Compl. ¶ 63 (quotation marks omitted), Ralls relocated the windfarm but it remains within the restricted airspace.

Ralls's complaint alleges that Oregon Windfarms, LLC, has developed nine other windfarm projects (Echo Projects) in the same general vicinity as the Butter Creek projects and that all nine use foreign-made wind turbines. According to Ralls, seven turbines used by the Echo Projects are located within the restricted airspace and one of the nine Echo Projects—Pacific Canyon—is currently owned by foreign investors. In addition, Ralls claims that there are "dozens if not hundreds of

existing turbines in or near the western region of the restricted airspace" that "are foreign-made and foreign-owned." Am. Compl. ¶ 57. The Appellees conceded at oral argument that there are other foreign-owned wind turbines near the restricted airspace. *See* Recording of Oral Argument at 32:43.

On June 28, 2012,[6] Ralls submitted a twenty-five-page notice to CFIUS informing it of Ralls's March acquisition of the Project Companies.[7] The notice explained why Ralls believed the transaction did not pose a national security threat. CFIUS initiated its review pursuant to 50 U.S.C. app. § 2170(b)(1). During the thirty-day review period, Ralls responded to several questions posed by CFIUS and gave a presentation to CFIUS officials. Ralls contends that CFIUS did not apprise Ralls of the gravamen of its concern with the transaction and did not, during the presentation or at any other time, disclose to Ralls the information it reviewed.

CFIUS determined that Ralls's acquisition of the Project Companies posed a national security threat and on July 25 it issued an Order Establishing Interim Mitigation Measures (July Order) to mitigate the threat. The July Order required Ralls to (1) cease all construction and operations at the Butter Creek project sites, (2) "remove all stockpiled or stored items from the [project sites] no later than July 30, 2012, and shall not deposit, stockpile, or store any new items at the [project sites]" and (3) cease all access to the project sites. Joint Appendix (JA) 82-83, *Ralls v. Comm. on Foreign Inv. in the U.S.*, No. 13-5315 (D.C. Cir. Feb. 7, 2014). Five days later,

---

[6] Unless otherwise indicated, all events occurred in 2012.

[7] Ralls conceded in district court that it submitted the notice only after CFIUS informed it that the Defense Department intended to file a notice triggering CFIUS review if Ralls did not file first.

July 30, CFIUS launched an investigation under 50 U.S.C. app. § 2170(b)(2).

Three days into its investigation, August 2, CFIUS issued an Amended Order Establishing Interim Mitigation Measures (CFIUS Order). In addition to the July Order restrictions, the CFIUS Order prohibited Ralls from completing any sale of the Project Companies or their assets without first removing all items (including concrete foundations) from the Butter Creek project sites, notifying CFIUS of the sale and giving CFIUS ten business days to object to the sale. The CFIUS Order remained in effect "until CFIUS concludes action or the President takes action under section 721" or until express "revocation by CFIUS or the President." JA 88. Neither the July Order nor the CFIUS Order disclosed the nature of the national security threat the transaction posed or the evidence on which CFIUS relied in issuing the orders. On September 13, the investigation period ended and CFIUS submitted its report (including its recommendation) [8] to the President, requesting his decision.

On September 28, the President issued an "Order Regarding the Acquisition of Four U.S. Wind Farm Project Companies by Ralls Corporation" (Presidential Order). The Presidential Order stated that "[t]here is credible evidence that leads [the President] to believe that Ralls . . . might take action that threatens to impair the national security of the United States" and that "[p]rovisions of law, other than section 721 and the International Emergency Economic Powers Act . . . do not, in [the President's] judgment, provide adequate and appropriate authority for [the President] to protect the national security in this matter." JA 89. In light of the findings, the

---

[8] Although the record includes copies of the two orders CFIUS issued in July and August, it does not contain the September report and recommendation CFIUS submitted to the President.

Presidential Order directed that the transaction be prohibited. "In order to effectuate" the prohibition, the Presidential Order required Ralls to, *inter alia*, (1) divest itself of all interests in the Project Companies, their assets and their operations within ninety days of the Order, (2) remove all items from the project sites "stockpiled, stored, deposited, installed, or affixed thereon," (3) cease access to the project sites, (4) refrain from selling, transferring or facilitating the sale or transfer of "any items made or otherwise produced by the Sany Group to any third party for use or installation at the [project sites]" and (5) adhere to restrictions on the sale of the Project Companies and their assets to third parties. JA 89-91. The Presidential Order also "revoked" both orders issued by CFIUS. JA 91.

It is undisputed that neither CFIUS nor the President gave Ralls notice of the evidence on which they respectively relied nor an opportunity to rebut that evidence. *See infra* note 19.

## C. DISTRICT COURT PROCEEDINGS

Approximately two weeks before the Presidential Order issued, Ralls filed suit against CFIUS and its then-chairman, Treasury Secretary Timothy Geithner, in district court. Ralls sought to invalidate the CFIUS Order and to enjoin its enforcement, claiming that CFIUS exceeded its statutory authority and acted arbitrarily and capriciously in issuing the Order in violation of the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 *et seq.*, and that the Order deprived Ralls of its constitutionally protected property interests in violation of the Due Process Clause of the Fifth Amendment to the United States Constitution. The next day, September 13, Ralls moved for a temporary restraining order and preliminary injunction (TRO/PI). The hearing on the TRO/PI motion was set for September 20 but Ralls voluntarily withdrew the motion the day before the hearing.

After the President issued the Presidential Order on September 28, Ralls amended its complaint to add claims challenging the Presidential Order and naming the President as a defendant. The amended complaint included five counts: Counts I and II challenged the CFIUS Order under the APA; Count III attacked the actions of the Appellees as *ultra vires*; Counts IV and V challenged the constitutionality of both orders, under the Fifth Amendment Due Process Clause (Count IV) and the Equal Protection Clause (Count V).

CFIUS and the President moved to dismiss Ralls's complaint for lack of subject-matter jurisdiction, which motion the district court granted in part and denied in part in February 2013. The court first concluded that section 721 barred judicial review of Ralls's *ultra vires* and equal protection challenges to the Presidential Order but not Ralls's due process challenge thereto. It also concluded that Ralls's claims regarding the CFIUS Order were mooted by the Presidential Order. It therefore dismissed Counts I, II, III and V in their entirety and the portion of Count IV challenging the CFIUS Order.

Shortly thereafter, the Appellees moved to dismiss Ralls's due process claim attacking the Presidential Order for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The district court eventually granted the motion in October 2013. In dismissing Ralls's remaining due process claim, it first determined that the Presidential Order did not deprive Ralls of a constitutionally protected property interest. Although the court acknowledged that Ralls had "entered into a transaction in March 2012 through which it obtained certain property rights under state law," *Ralls Corp. v. Comm. on Foreign Inv. in the United States*, --- F. Supp. 2d ----, No. 1:12-cv-01513, 2013 WL 5565499, at *6 (D.D.C. Oct. 9, 2013, as amended on Oct. 10, 2013), it nonetheless found that Ralls

had no constitutionally protected interest because Ralls "voluntarily acquired those state property rights subject to the known risk of a Presidential veto" and "waived the opportunity . . . to obtain a determination from CFIUS and the President before it entered into the transaction," *id.* at \*7. The court then concluded that, even if Ralls had a constitutionally protected property interest, the Appellees provided Ralls with due process. According to the court, CFIUS informed Ralls in June 2012 that the transaction had to be reviewed and gave Ralls the opportunity to submit evidence in its favor in its notice filing and during follow-up conversations with—and a presentation to—CFIUS officials.

Ralls timely appealed the district court's Rule 12(b)(6) dismissal of its due process challenge to the Presidential Order and the Rule 12(b)(1) dismissal of its five CFIUS Order claims.[9] We first address the dismissal of Ralls's due process claim against the Presidential Order (Count IV in part) and then turn to the dismissal of its CFIUS Order claims (Counts I and II in their entirety and Counts III, IV and V, in part).

## II. DUE PROCESS CLAIM

Our first order of business is to satisfy ourselves that we have jurisdiction to review the dismissal of Ralls's due process challenge to the Presidential Order. *See Bancoult v. McNamara*, 445 F.3d 427, 432 (D.C. Cir. 2006) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)). "The requirement that jurisdiction be established as a threshold matter 'springs from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.' " *Steel Co.*, 523 U.S. at 94-95 (quoting *Mansfield, C. &*

---

[9] Ralls does not appeal the dismissal of its *ultra vires* and equal protection challenges to the Presidential Order (Count III in part and Count V in part).

*L.M.R. Co. v. Swan*, 111 U.S. 379, 382 (1884)) (brackets omitted). The Appellees argue, first, that section 721 expressly deprives us of jurisdiction of the due process claim and, second, that the claim is non-justiciable. Rejecting the Appellees' two jurisdictional challenges, we then treat the merits.

## A. STATUTORY BAR TO JUDICIAL REVIEW

As noted, the DPA provides that

[t]he actions of the President under paragraph (1) of subsection (d) of this section and the findings of the President under paragraph (4) of subsection (d) of this section shall not be subject to judicial review.

50 U.S.C. app. § 2170(e). The "actions of the President" referred to are "such action[s] for such time as the President considers appropriate to suspend or prohibit any covered transaction that threatens to impair the national security of the United States." *Id.* § 2170(d)(1). The President's "findings" under subsection (d) of paragraph (4) include his determination that (1) there is "credible evidence that leads [him] to believe that the foreign interest exercising control might take action that threatens to impair the national security" and (2) other provisions of law do not give him adequate authority to protect the national security. *Id.* § 2170(d)(4).

The Supreme Court has long held that a statutory bar to judicial review precludes review of constitutional claims only if there is "clear and convincing" evidence that the Congress so intended. *See, e.g.*, *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 681 (1986); *Califano v. Sanders,* 430 U.S. 99, 109 (1977); *Weinberger v. Salfi*, 422 U.S. 749, 762 (1975); *Johnson v. Robison*, 415 U.S. 361, 373-74 (1974). Our precedent makes clear that the "particularly rigorous"

clear-and-convincing standard applies to both facial and as-applied constitutional claims. *Griffith v. FLRA*, 842 F.2d 487, 494 (D.C. Cir. 1988) (quotation marks omitted); *see also Ungar v. Smith*, 667 F.2d 188, 193 (D.C. Cir. 1981); *Ralpho v. Bell*, 569 F.2d 607, 619-20 (D.C. Cir. 1977). [10] As we

---

[10] Citing *General Electric Co. v. EPA*, 360 F.3d 188 (D.C. Cir. 2004), the Appellees argue that clear and convincing evidence of congressional intent is not required to preclude judicial review of an *as-applied* constitutional claim. *See* Br. for the Appellees 26-27 & n.3, *Ralls Corp. v. Comm. on Foreign Inv. in the U.S.*, No. 13-5315 (D.C. Cir. Mar. 14, 2014). But *General Electric Co.* did not announce a different rule from *Griffith*, *Ungar* and *Ralpho*. In *General Electric Co.*, we concluded that we did not need to "resort to the doctrine of constitutional avoidance to support our interpretation of the text" because it was clear that the text did not preclude the constitutional claim at issue. *Id.* at 194. In other words, there was no need to apply the clear-and-convincing evidence standard because the provision plainly allowed review. *See id.*

Moreover, we do not think application of the clear-and-convincing standard to as-applied constitutional claims is undermined by more recent decisions. In *McBryde v. Committee to Review Circuit Council Conduct and Disability Orders of the Judicial Conference of the United States*, 264 F.3d 52 (D.C. Cir. 2001), we stated that "[w]e pretermit the possibility that the Supreme Court's decision in *Traynor v. Turnage*, 485 U.S. 535, 542-44 (1988), postdating the last of the circuit trilogy (*Griffith*), has undermined" the reason for applying the clear-and-convincing standard to as-applied constitutional claims. *McBryde*, 264 F.3d at 59. We noted that *Traynor* "may have done so by treating the *Robison* decision (source of the circuit trilogy) as deriving more from statutory language . . . and less from ideas of special status for constitutional claims." *Id.* at 59-60. Although *McBryde* expressed some doubt as to the continued vitality of the clear-and-convincing standard, we nonetheless applied that standard in *McBryde* and we do not now read *Traynor* as requiring a different approach. In short, *Griffith*, *Ungar* and *Ralpho* remain good law and we are bound to

recognized in *Ungar*, the Supreme Court and this Court have required "the clearest evocation of congressional intent to proscribe judicial review of constitutional claims" in light of the "constitutional dangers inherent in denying a forum in which to argue that government action has injured interests that are protected by the Constitution." 667 F.2d at 193; *see also Robison*, 415 U.S. at 366-67. In applying the clear-and-convincing evidence standard, we examine both the text of the statute and the legislative history for evidence of congressional intent to bar judicial review of constitutional claims. *See Robison*, 415 U.S. at 367-71; *Griffith*, 842 F.2d at 494; *Ungar*, 667 F.2d at 193; *Ralpho*, 569 F.2d at 617-22 & n.59.

Beginning with *Ralpho*, we determined that a broadly worded statutory bar did not preclude our consideration of a procedural due process claim. By the Micronesian Claims Act of 1971 (MCA), the Congress created the Micronesian Claims Commission (Commission) to administer a five million dollar fund to Micronesians injured during World War II. *Ralpho*, 569 F.2d at 613. The MCA provided that the Commission's settlement and disbursement actions "shall be final and conclusive for all purposes, notwithstanding any other provision of law to the contrary and not subject to review." *Id.* (quoting 50 U.S.C. app. § 2020 (1972)). A claimant brought suit in district court alleging that "his right to a fair hearing" under the Due Process Clause "was abridged by the Commission's reliance upon 'secret' extra-record evidence." *Id.* at 611. Relying on the statutory bar, the district court dismissed the claim for lack of jurisdiction but we

---

follow them. *See United States v. Carson*, 455 F.3d 336, 384 n.43 (D.C. Cir. 2006) ("[W]e are, of course, bound to follow circuit precedent absent contrary authority from an en banc court or the Supreme Court." (citing *Brewster v. Comm'r*, 607 F.2d 1369, 1373 (D.C. Cir. 1979))).

reversed. We found no affirmative statement in the text of the statute or the legislative history addressing judicial review of constitutional claims and *a fortiori* no clear and convincing evidence that the Congress intended to bar judicial review of such claims. *Id.* at 621-22; *see also Griffith*, 842 F.2d at 494 ("finding in the legislative history no affirmative statement addressed to preclusion of *constitutional* claims, we held there was no preclusion of such claims" in *Ralpho* (emphasis in *Griffith*)).

We reached a similar result in *Ungar*. There, individuals with interests in a Hungarian corporation filed claims with the then-functioning Office of Alien Property (OAP) for the return of property seized from them during World War II. *See Ungar*, 667 F.2d at 190. After the OAP denied their claims, they pressed a due process challenge to the claims process, alleging that the OAP had not given them sufficient time to prepare their case. *Id.* at 197. Although a statute rendered all OAP claims determinations "final" and "not . . . subject to review by any court," *id.*, we concluded that the statute did not bar our review of the constitutional claim. Specifically, we found that neither the text of the statute nor the legislative history—which history contained "no reference to the proscription of judicial review"—evinced a clear congressional intent to bar the due process claim. *Id.* at 194-95. Notably, we were "not willing" to conclude from the Congress's unexplained rejection of an "elaborate scheme for trial of just-compensation claims in the Court of Claims" set forth in an earlier bill that the Congress intended to bar judicial review of constitutional claims.[11] *Id.* at 195 n.2.

---

[11] In *Griffith*, we declined a similar invitation to draw inferences from legislative history. *See* 842 F.2d at 494. There, we concluded that a conference committee's "silent deletion" of a provision in the original Senate bill providing for judicial review of Federal Labor Relations Authority decisions involving a

We took a somewhat different approach to legislative history in *McBryde v. Committee to Review Circuit Council Conduct and Disability Orders of Judicial Conference of U.S.*, 264 F.3d 52 (D.C. Cir. 2001). In *McBryde*, a Texas federal district judge raised a procedural due process challenge to a decision of the Judicial Council of the Fifth Circuit—affirmed by the Committee to Review Circuit Council Conduct and Disability Orders of the Judicial Conference of the United States (Review Committee)—sanctioning him for judicial misconduct. *Id.* at 54-55. In sanctioning McBryde, both the Judicial Council and the Review Committee acted under the authority of the Judicial Conduct and Disability Act of 1980, which contained a review provision mandating that "all orders and determinations" made by a committee of the Judicial Conference "shall be final and conclusive and shall not be judicially reviewable on appeal or otherwise." *Id.* at 58 (quoting 28 U.S.C. § 372(c)(10) (2001)). In interpreting the preclusive effect of the review provision, we found the legislative history dispositive. Specifically, we determined that, by rejecting a Senate proposal to create a new Article III court to review judicial disciplinary proceedings, the Congress clearly expressed its intent to bar review of McBryde's due process claim by a conventional Article III court. *Id.* at 62-63. Our conclusion hinged on the fact that a disciplined judge could obtain review of an as-applied constitutional claim by the Judicial Conference committee, which, like an Article III Court, was comprised of Article III judges. *Id.* at 63. To read the statute to *also* allow review of an as-applied constitutional claim by an Article III court, we concluded, "would generate substantial redundancy, an implausible legislative purpose." *Id.* at 62.

---

constitutional question was "not enough . . . to support an inference of intent to preclude constitutional claims." *Id.*

Notwithstanding the high hurdle this precedent has erected, the Appellees argue that section 2170(e) bars our review of Ralls's due process claim. According to the Appellees, the text of the provision—which precludes judicial review of "actions of the President under paragraph (1) of subsection (d)," 50 U.S.C. app. § 2170(e)—bars judicial review of *all* actions taken by the President under the statute, including "the President's choice not to provide Ralls with more notice than it had already received, his decision not to confide in Ralls his national security concerns, and his judgment about the appropriate level of detail with which to publicly articulate his reasoning." Br. for the Appellees 27, *Ralls Corp. v. Comm. on Foreign Inv. in the U.S.*, No. 13-5315 (D.C. Cir. Mar. 14, 2014).

Relying on *McBryde*, the Appellees also submit that we may infer from current and former congressional oversight provisions in the statute—and the portions of legislative history pertaining to them—that the Congress intended any review of the President's actions under the DPA to occur in the halls of the Congress, not in the courtrooms of the judiciary. They first point to legislative history relating to a now-superseded provision of the DPA requiring the President to "immediately transmit" to the Congress "a written report of the President's determination of whether or not to take action under subsection (d)." 50 U.S.C. app. § 2170(g) (1993). The legislative history indicates that this provision was intended to help the "Congress and the public develop an understanding of the policies underlying Presidential determinations, and hold the President accountable for actions under the Exon-Florio Amendment." H.R. CONF. REP. 102-966, at 731-32 (1992). They also cite former section 2170(k), which required the President, "[i]n order to assist the Congress in its oversight responsibilities," to furnish to the Congress a quadrennial report regarding foreign countries' efforts to acquire U.S.

companies involved in "critical technologies" or to "obtain[] commercial secrets related to critical technologies" therefrom. 50 U.S.C. app. § 2170(k) (1993). Under the current DPA, the President's suspension or prohibition of a covered transaction, as well as the President's critical technology assessment, are memorialized in a single annual report that is submitted to the Congress. *See* 50 U.S.C. app. § 2170(m). Finally, the Appellees direct our attention to the Foreign Investment and National Security Act of 2007 (FINSA), Pub. L. No. 110-49, 121 Stat. 246, which amended portions of section 721 of the DPA. According to a Senate report, the purpose of FINSA is "to strengthen Government review and oversight of foreign investment in the United States" and "to provide for enhanced Congressional oversight with respect thereto." S. REP. No. 109-264, at 1 (2006). FINSA purported to accomplish this objective by increasing oversight of CFIUS.[12]

We conclude that neither the text of the statutory bar nor the legislative history of the statute provides clear and convincing evidence that the Congress intended to preclude judicial review of Ralls's procedural due process challenge to the Presidential Order. First, the text does not preclude judicial review of Ralls's as-applied constitutional claim by barring review of all "actions of the President under paragraph (1) of subsection (d)." 50 U.S.C. app. § 2170(e). We think

---

[12] Among other changes, FINSA requires CFIUS to submit more detailed notices and reports to the Congress upon completion of individual reviews and investigations, *see* 50 U.S.C. app. § 2170(b)(3), (m), and provide prompt notice of the results of its review or investigation to the parties to a covered transaction, *see id.* § 2170(b)(6). FINSA also requires any agency acting on behalf of CFIUS to make detailed reports to CFIUS regarding "any agreement entered into or condition imposed" by the agency. *See id.* § 2170(*l*)(3)(B)(i).

the most natural reading, given its reference to subsection (d)(1), is that courts are barred from reviewing final "action[s]" the President takes "*to suspend or prohibit* any covered transaction that threatens to impair the national security of the United States."  *Id.* § 2170(d)(1) (emphasis added).  The text does not, however, refer to the reviewability of a constitutional claim challenging the *process* preceding such presidential action.[13]  This conclusion is consistent with *Ralpho* and *Ungar*, where we determined that similarly broad statutory language did not bar our review of constitutional claims challenging the process by which unreviewable determinations were reached.  *See Ungar*, 667 F.2d at 193-96; *Ralpho*, 569 F.2d at 620-22.

The Appellees' reliance on legislative history and congressional oversight provisions is equally unavailing.  To begin with, there is no legislative history expressly addressing judicial review of constitutional claims arising from the President's implementation of section 721.  Under *Ungar* and *Ralpho*, this gap may well be dispositive.  *See Ungar*, 667 F.2d at 195-96 (no clear and convincing evidence because "no reference to the proscription of judicial review" in legislative history of statute or its "relatives"); *Ralpho*, 569 F.2d at 621-22 (noting legislative history's "marked silence" on preclusion of judicial review for constitutional claims); *see also Griffith*, 842 F.2d at 494 (explaining that, in *Ralpho*, we concluded the statute did not preclude constitutional claims because there was "no affirmative statement addressed to preclusion" in the legislative history).  Although in *McBryde* we found clear and

---

[13] The legislative history of FINSA supports our reading. Specifically, Senate Report No. 109-264 notes that the bar-to-review provision precludes judicial review of "Presidential decisions resulting from exercise of the authorities" granted therein.  S. REP. NO. 109-264, at 11.  This statement supports the reading that the provision applies to the President's final decisions.

convincing evidence that the Congress intended to preclude review of constitutional claims *without* express legislative history to that effect, *McBryde* is *sui generis*. In *McBryde*, we were certain that the Congress intended to preclude our review of McBryde's as-applied constitutional claim because the procedure it established provided for review of such claims by Article III judges, making additional review by an Article III court superfluous. *See* 264 F.3d at 62-63. This is quite different from *Ralpho* and *Ungar* (and here), where *any* review by Article III judges is entirely contingent on the scope of the judicial review bar. *See Ungar*, 667 F.2d at 193; *Ralpho*, 569 F.2d at 616-17.

Even if the absence of express legislative history were not conclusive, the nature of congressional oversight currently provided for in the DPA does not demonstrate that the Congress intended to withhold a judicial forum for a due process claim challenging the procedure followed by the President. Congressional oversight of the President under the current version of the statute consists of an annual, *ex post* review of "decisions or actions by the President" taken under section 721 and the President's assessment of foreign efforts to acquire critical technologies. 50 U.S.C. app. § 2170(m)(2), (3). We hardly think that, by reserving to itself such limited review of presidential actions and critical technology assessments, the Congress intended to abrogate the courts' traditional role of policing governmental procedure for constitutional infirmity and perform that function itself. *See, e.g.*, *Landon v. Plasencia*, 459 U.S. 21, 34-35 (1982) (even where matters are "largely within the control of the executive and the legislature," judiciary retains role in determining whether procedures employed by other branches "meet the essential standard of fairness under the Due Process Clause"). Indeed, the inferences to be drawn from the oversight provisions are unquestionably weaker than the inferences to be

drawn from the Congress's rejection of (1) a judicial review scheme for trial of just compensation claims, *see Ungar*, 667 F.2d at 195 & n.2, or (2) a provision expressly providing for judicial review of FLRA decisions involving constitutional claims, *see Griffith*, 842 F.2d at 495. Yet in neither circumstance did we find clear and convincing evidence that the Congress intended to preclude judicial review of constitutional claims. *See Griffith*, 842 F.2d at 495; *Ungar*, 667 F.2d at 195 & n.2.

## B. JUSTICIABILITY

The Appellees also argue that Ralls's due process challenge to the Presidential Order raises a non-justiciable political question. *See* Br. for the Appellees 31 (due process challenge to Presidential Order "calls for non-judicial discretion, is constitutionally committed to the Executive Branch, and offers no judicially discoverable or manageable standards"). "The political question doctrine is essentially a function of the separation of powers and excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 840 (D.C. Cir. 2010) (*en banc*) (quotation marks and citation omitted); *see also Schneider v. Kissinger*, 412 F.3d 190, 193 (D.C. Cir. 2005) ("[T]he courts lack jurisdiction over political decisions that are by their nature committed to the political branches to the exclusion of the judiciary . . . ." (quotation marks omitted)).

The framework to determine if a complaint presents a non-justiciable political question is set forth in *Baker v. Carr*, 369 U.S. 186 (1962). Under *Baker*, the political question doctrine bars a court from considering a claim when

> [p]rominent on the surface of [the] case . . . is found a [1] textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217; *see also Wilson v. Libby*, 535 F.3d 697, 704 (D.C. Cir. 2008). Because "[t]he *Baker* analysis lists the six factors in the disjunctive, not the conjunctive," the Court "need only conclude that one factor is present, not all," to apply the political question doctrine. *Schneider*, 412 F.3d at 194.

Although "[m]atters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention," *Haig v. Agee*, 453 U.S. 280, 292 (1981), "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance," *Baker*, 369 U.S. at 211; *see also Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986) (court may not decline to adjudicate dispute "merely because [a] decision may have significant political overtones"); *accord Zivotofsky ex rel. Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1427-30 (2012). Indeed, "the judiciary is the ultimate interpreter of the Constitution [and,] in most instances[,] claims alleging its violation will rightly be heard by the courts." *El-Shifa*, 607 F.3d at 841-42 (quotation marks and citation omitted); *see also id.* at 841 ("Even in the context of military action, the courts

may sometimes have a role."). Thus, we do not automatically decline to adjudicate legal questions if they may implicate foreign policy or national security. Instead, we "must conduct 'a discriminating analysis of the particular question posed' in the 'specific case' before the court to determine whether the political question doctrine prevents a claim from going forward." *Id.* at 841 (quoting *Baker*, 369 U.S. at 211).

Our decisions reviewing Foreign Terrorist Organization (FTO) designations made by the Secretary of State illustrate, against a national security backdrop, the distinction between a justiciable legal challenge and a non-justiciable political question. Pursuant to 8 U.S.C. § 1189(a)(1),[14] the Secretary of State may designate a foreign entity as a FTO if he finds three things: (1) the organization is foreign, (2) the organization engages in "terrorist activity" as that term is defined in AEDPA and (3) the terrorist activity of the organization threatens national security or U.S. nationals. Notwithstanding the foreign policy and national security interests implicated by a FTO designation, we concluded in *People's Mojahedin Organization of Iran v. Department of State* (*PMOI I*), 182 F.3d 17 (D.C. Cir. 1999), that the Secretary's compliance with the first two statutory criteria— that is, whether the entity is (1) foreign and (2) engages in terrorist activity—is judicially reviewable. *Id.* at 23-25. What remains outside our review, we held, is the Secretary's finding that the organization threatens national security. *Id.* at 23. We concluded that we were "not competent to pass upon" this finding because it presented a political question involving

---

[14] This provision is included in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, Div. C., 110 Stat. 3009, 3009-546.

"foreign policy decisions of the Executive Branch . . . for which the Judiciary has neither aptitude, facilities nor responsibility" to make.  *Id.* (quotation marks omitted).

But the Appellees contend that Ralls's procedural due process claim differs from the determinations we reviewed in *PMOI I.*[15]  Specifically, they claim that "Ralls asks this Court to decide whether and how the President must engage a would-be foreign investor in deliberations on the question of the national security risk a transaction poses, when and if the President must reveal his thinking, and in what level of detail." Br. for the Appellees 31.  "[S]uch a determination," they argue, "calls for non-judicial discretion, is constitutionally committed to the Executive Branch, and offers no judicially discoverable or manageable standards."  *Id.*

We disagree.  First, Ralls's due process claim does *not* challenge (1) the President's determination that its acquisition of the Project Companies threatens the national security or (2) the President's prohibition of the transaction in order to mitigate the national security threat.  Much like the political question we declined to consider in *PMOI I*, reviewing *these* determinations would require us to exercise judgment in the realm of foreign policy and national security.  But Ralls does not request that we exercise such judgment.  Instead, Ralls

---

[15] In addition to *PMOI I*, 182 F.3d 17, we also resolved due process challenges to FTO designations in *National Council of Resistance of Iran v. Department of State* (*NCRI*), 251 F.3d 192 (D.C. Cir. 2001), and *People's Mojahedin Organization of Iran v. Department of State* (*PMOI II*), 613 F.3d 220 (D.C. Cir. 2010) (*per curiam*).  We do not rely on *NCRI* or *PMOI II* in the justiciability context, however, because neither addressed the political question doctrine.  *See, e.g.*, *Defenders of Wildlife v. Perciasepe*, 714 F.3d 1317, 1325 (D.C. Cir. 2013) (*sub silentio* jurisdictional holding has no precedential effect).

asks us to decide whether the Due Process Clause entitles it to have notice of, and access to, the evidence on which the President relied and an opportunity to rebut that evidence before he reaches his non-justiciable (and statutorily unreviewable) determinations. *See infra* note 19. We think it clear, then, that Ralls's due process claim does not encroach on the prerogative of the political branches, does not require the exercise of non-judicial discretion and is susceptible to judicially manageable standards. To the contrary, and as the Supreme Court recognized long ago, interpreting the provisions of the Constitution is the role the Framers entrusted to the judiciary. *See Zivotfsky*, 132 S. Ct. at 1427-28 ("It is emphatically the province and duty of the judicial department to say what the law is." (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803))).[16]

## C. THE MERITS

"We review the grant of a motion to dismiss *de novo*," *Cal. Valley Miwok Tribe v. United States*, 515 F.3d 1262, 1266 (D.C. Cir. 2008), "treat[ing] the complaint's factual allegations as true and . . . grant[ing] plaintiff the benefit of all inferences that can be derived from the facts alleged," *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quotation marks and citation omitted). We do not accept as true, however, the plaintiff's legal conclusions or inferences that are unsupported by the facts alleged. *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). "So long as the pleadings suggest a 'plausible' scenario to 'show that the pleader is entitled to relief,' a court may not dismiss." *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 681 (D.C. Cir.

---

[16] For the foregoing reasons, we also conclude that justiciability does not present an obstacle to our consideration of the CFIUS Order claims.

2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 557 (2007)) (brackets and quotation marks omitted).

The gravamen of Ralls's challenge to the Presidential Order is that the President deprived it of its constitutionally protected property interests in the Project Companies and their assets without due process of law. The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. "The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.' " *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999). If the plaintiff has been deprived of a protected interest, we then consider whether the procedures used by the Government in effecting the deprivation "comport with due process." *Id.*

### 1. Constitutionally Protected Property Interest

"Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.' " *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998) (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)); *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985). In other words, property interests "attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law." *Paul v. Davis*, 424 U.S. 693, 710 (1976).

The district court found, and the Appellees do not dispute, that Ralls possessed state law property interests when it acquired 100% ownership of the Project Companies and their assets, including local easements permitting the construction of wind turbines, power purchase and generator interconnection

agreements with the local utility, transmission interconnection and management agreements with nearby windfarms and the necessary permits and approvals to construct wind turbines. *See Ralls Corp.*, 2013 WL 5565499, at *6 ("There is no dispute that plaintiff Ralls entered into a transaction in March 2012 through which it obtained certain property rights under state law."); Br. for the Appellees 37 ("It may be assumed that Ralls acquired some state property rights through its transaction . . . ."). We agree with the district court on this score—there can be no doubt that Ralls's interests in the Project Companies and their assets constitute "property" under Oregon law. *See, e.g.*, Or. Rev. Stat. Ann. § 63.239 ("A membership interest [in an Oregon LLC] is personal property."); *McQuaid v. Portland & V. Ry. Co.*, 22 P. 899, 906 (Or. 1889) (holder of easement has property interest); *Bunnell v. Bernau*, 865 P.2d 473, 473-74 (Or. Ct. App. 1993) (same); *see also Lynch v. United States*, 292 U.S. 571, 579 (1934) ("Valid contracts are property [under the Fifth Amendment], whether the obligor be a private individual, a municipality, a state, or the United States.").

In the usual case, the fact that the property interest is recognized under state law is enough to trigger the protections of the Due Process Clause. *See, e.g.*, *Phillips*, 524 U.S. at 163-64; *Loudermill*, 470 U.S. at 538; *Paul*, 424 U.S. at 710. Yet here, the district court concluded that Ralls's state law property interests were *not* constitutionally protected because Ralls (1) acquired its property interests "subject to the known risk of a Presidential veto" and (2) "waived the opportunity . . . to obtain a determination from CFIUS and the President before it entered into the transaction." *Ralls Corp.*, 2013 WL 5565499, at *7. The Appellees take up this mantle on appeal, arguing that Ralls's property interests are too contingent to merit constitutional protection and that Ralls effectively forfeited those interests by not seeking pre-approval of the transaction.

We reject the rationale used by the district court and advocated by the Appellees. First, we disagree with the notion that Ralls's state-law property interests are too contingent for constitutional protection. Ralls's state-law property rights fully vested upon the completion of the transaction, meaning due process protections necessarily attached. There is nothing "contingent" about the interests Ralls obtained under state law, and the Appellees offer no legal support—other than the district court order—for the proposition that the nature of a property interest recognized under *state* law is affected by potential *federal* deprivation. As Ralls aptly notes, the Federal Government cannot evade the due process protections afforded to state property by simply "announcing that future deprivations of property may be forthcoming." Br. for Appellant 21, *Ralls Corp. v. Comm. on Foreign Inv. in the U.S.*, No. 13-5315 (D.C. Cir. Feb. 7, 2014).

This case is quite different from *Dames & Moore v. Regan*, 453 U.S. 654 (1981), relied upon by the Appellees. There, the Court concluded that petitioner Dames & Moore's attachment of Iranian property was too contingent to "support a constitutional claim for compensation" under the Takings Clause of the Fifth Amendment, *id.* at 674 n.6, because, according to regulations promulgated by the Treasury Department's Office of Foreign Assets Control, attachments of Iranian property were "null and void" unless licensed and all licenses could be " 'amended, modified, or revoked at any time' " by the President, *id.* at 672-73 (quoting 31 C.F.R. § 535.805 (1980)). Thus, Dames & Moore obtained its right to attach only after it was licensed by the Government, which license was itself revocable at any time and, presumably, for any reason. We think there is a significant difference between Ralls's fully-vested state property interests and an interest like the *Dames & Moore* attachment, which interest is contingent at

best.[17]  There is no contingency built into the *state* law from which Ralls's property interests derive and to which interests due process protections traditionally apply.  *See, e.g.*, *Phillips*, 524 U.S. at 163-64; *Loudermill*, 470 U.S. at 538; *Paul*, 424 U.S. at 710.

Nor do we think Ralls has waived its property interest by failing to seek pre-approval of the transaction.  The district court found wavier based on two out-of-circuit cases: *Alvin v. Suzuki*, 227 F.3d 107 (3d Cir. 2000), and *Parker v. Board of Regents of the Tulsa Junior College*, 981 F.2d 1159 (10th Cir. 1992).  In those cases, our two sister circuits declared that there can be no claim of a due process violation if a plaintiff voluntary foregoes the due process procedures provided him.  *See Alvin*, 227 F.3d at 116 ("[A] procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies."); *Parker*, 981 F.2d at 1163 ("There is no violation of due process, because plaintiff chose to end her employment without a hearing and not to avail herself of the available due process procedures.").  But those cases hold that a party who has foregone due process procedures may not then complain that he was accorded inadequate process, not that he loses his property interest by foregoing the procedures.  *See Alvin*, 227 F.3d at 116; *Parker*, 981 F.2d at 1163; s*ee also Loudermill*, 470 U.S. at 541 (" 'Property' cannot be defined by the procedures provided for its deprivation.").  Thus, to the extent the cases are relevant, their relevance is only at the *second* step of the

---

[17] Moreover, the Court in *Dames & Moore* went out of its way to stress that its holding has limited, if any, application beyond its particular facts.  *See Dames & Moore*, 453 U.S. at 661 ("We attempt to lay down no general 'guidelines' covering other situations not involved here, and attempt to confine the opinion only to the very questions necessary to decision of the case.").

due process inquiry; namely, what process is due?[18]  In any event, we do not think the failure to seek pre-approval works a waiver when the regulatory scheme expressly contemplates that a party to a covered transaction may request approval—if the party decides to submit a voluntary notice at all—either before *or after* the transaction is completed.  *See* 31 C.F.R. §§ 800.401(a), 800.402(c)(1)(vii), 800.224.

## 2. What Process is Due?

"[U]nlike some legal rules," due process "is not a technical conception with a fixed content unrelated to time, place and circumstances."  *Nat'l Council of Resistance of Iran v. Dep't of State* (*NCRI*), 251 F.3d 192, 205 (D.C. Cir. 2001) (quoting *Gilbert v. Homar*, 520 U.S. 924, 930 (1997)) (quotation marks omitted).  To the contrary, "due process is flexible and calls for such procedural protections as the particular situation demands."  *Id.* (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).  In the seminal case of *Mathews v. Eldridge*, the United States Supreme Court established a three-factor balancing test to determine the "specific dictates of due process":

---

[18] But even at the second step of the due process inquiry, the cases do not support the Appellees' position.  We read them to say that a party "waives" a due process claim only if he foregoes *constitutionally adequate* procedures.  *See Alvin*, 227 F.3d at 116 ("[P]laintiff must have taken advantage of the processes that are available to him or her, *unless those processes are unavailable or patently inadequate*." (emphasis added)); *Parker*, 981 F.2d at 1163 ("There is no violation of due process, because plaintiff chose to end her employment without a hearing and not to avail herself of the available *due process procedures*." (emphasis added)).  There is no indication that the process Ralls received after the transaction was completed is different from the process it would have received had it sought pre-approval—and, as discussed *infra*, that process was inadequate.

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. 319, 335 (1976). Due process ordinarily requires that procedures provide notice of the proposed official action and "the opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* at 333 (quotation marks omitted); *see also NCRI*, 251 F.3d at 205 ("[T]hose procedures which have been held to satisfy the Due Process Clause have included notice of the action sought, along with the opportunity to effectively be heard." (quotation marks omitted)). Both the Supreme Court and this Court have recognized that the right to know the factual basis for the action and the opportunity to rebut the evidence supporting that action are essential components of due process. *See, e.g.*, *Greene v. McElroy*, 360 U.S. 474, 496 (1959) (citing "immutable" principle in case involving revocation of security clearance that "the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue"); *Gray Panthers v. Schweiker*, 652 F.2d 146, 165 (D.C. Cir. 1980) (claimants with Medicare reimbursement claims under $100 dollars entitled to "core requirements of due process"—"adequate notice of why the benefit is being denied and a genuine opportunity to explain why it should not be").

We believe our precedent involving the Secretary of State's proposed FTO designations makes clear that the due process right to notice of the FTO designation as well as the unclassified support therefor and the opportunity to rebut the

unclassified supporting evidence holds true for the procedural scheme set forth in the DPA. *See, e.g.*, *People's Mojahedin Org. of Iran v. Dep't of State* (*PMOI II*), 613 F.3d 220 (2010) (D.C. Cir. 2010) (*per curiam*); *Chai v. Dep't of State*, 466 F.3d 125 (D.C. Cir. 2006); *NCRI*, 251 F.3d 192. Just as a mitigation order issued under the DPA may affect property interests of a party to a covered transaction, a FTO designation may also affect property interests: an entity so designated is prohibited from accessing its U.S. bank accounts. 18 U.S.C. § 2339B(a)(1), (2). Notwithstanding the property interests potentially at stake, the statutory process by which the Secretary of State makes the FTO designation accords the FTO designee no procedural protections. *See NCRI*, 251 F.3d at 196 ("The unique feature of th[e] statutory procedure is the dearth of procedural participation and protection afforded the designated entity."); *see also id.* ("At no point in the proceedings establishing the administrative record is the alleged [FTO] afforded notice of the materials used against it, or a right to comment on such materials or the developing administrative record.").

Reviewing a due process challenge to the FTO designation process, we concluded in *NCRI* that NCRI could not be designated a FTO and thereby deprived of its interest in a "small bank account" without first receiving notice of the proposed designation, access to the unclassified evidence supporting the designation and an opportunity to rebut that evidence. 251 F.3d at 201, 208-09. These procedural protections are required by the Due Process Clause, we held, notwithstanding the Government's "compelling" interest in national security, *id.* at 207, and despite our uncertainty that NCRI could effectively rebut the Secretary's evidence, *id.* at 209 ("We have no reason to presume that the petitioners . . . could have offered evidence which might have . . . changed the Secretary's mind . . . . However, without the due process

protections which we have outlined, we cannot presume the contrary either."); *see also PMOI II*, 613 F.3d at 228 (following *NCRI* and rejecting State's argument that "nothing the [FTO] would have offered . . . could have changed [the Secretary's] mind"). At the same time, we made clear—and we iterate today—that due process does not require disclosure of *classified* information supporting official action. *See NCRI*, 251 F.3d at 209-10 (classified information "is within the privilege and prerogative of the executive, and we do not intend to compel a breach in the security which that branch is charged to protect"). We have consistently followed *NCRI* in subsequent FTO cases. *See, e.g.*, *PMOI II*, 613 F.3d at 227; *Chai*, *supra*.

Notwithstanding this precedent, the district court concluded that Ralls received adequate process because it was notified that the transaction was subject to review and was given an opportunity to present evidence in its favor in both its voluntary notice filing and during follow-up conversations with—and a presentation to—CFIUS officials. In light of the Appellees' substantial interest in protecting national security, the court determined that no additional process was required. Notably, the district court found *NCRI* and its progeny inapplicable. *NCRI* was inapplicable, the court said, in that it mandated disclosure of unclassified information only because the information was eventually going to be publicly available. *See Ralls Corp.*, 2013 WL 5565499, at *14 (quoting *NCRI*, 251 F.3d at 209 ("[T]he Secretary has shown no reason not to offer the designated entities notice of the administrative record which will in any event be filed publicly . . . .")). The court also suggested that *NCRI* and our other FTO decisions should not govern given the unique statutory scheme involved in those cases. According to the court, "AEDPA has a judicial review provision, and it requires the creation of an administrative record for the purpose of that review, and those circumstances

clearly underlie the rulings of the Court of Appeals." *Id.* at *13.

The Appellees make a similar argument in their brief, arguing that Ralls's ability to submit written arguments, meet with CFIUS officials in person, answer follow-up questions and receive advance notice of the Appellees' intended action constitutes sufficient process in light of the national security interests at stake. The Appellees similarly urge the inapplicability of the FTO cases, arguing that they do "not meaningfully resemble" this case because "the decision whether to prohibit Ralls' transaction was committed to the President's discretion." Br. for the Appellees 42. Finally, the Appellees assert that Ralls cannot "utilize this Court to force disclosure of the President's thinking on sensitive questions in discretionary areas and obtain otherwise forbidden judicial review." *Id.* at 41. And, even if such process *is* required, the Appellees requested—for the first time during oral argument—that we remand so that the district court can consider whether disclosure of certain unclassified information is nonetheless shielded by executive privilege.

We conclude that the Presidential Order deprived Ralls of its constitutionally protected property interests without due process of law. As the preceding discussion makes plain, due process requires, at the least, that an affected party be informed of the official action, be given access to the unclassified evidence on which the official actor relied and be afforded an opportunity to rebut that evidence. *See, e.g.*, *McElroy*, 360 U.S. at 496; *NCRI*, 251 F.3d at 208-09; *Schweiker*, 652 F.2d at 165. Although the Presidential Order deprived Ralls of significant property interests—interests, according to the district court record, valued at $6 million—Ralls was not given any of these procedural protections at any point. Under our FTO precedent, this lack of process constitutes a clear

constitutional violation, notwithstanding the Appellees' substantial interest in national security and despite our uncertainty that more process would have led to a different presidential decision. *See, e.g.*, *PMOI II*, 613 F.3d at 228; *NCRI*, 251 F.3d at 208-09. As the FTO cases make plain, a substantial interest in national security supports withholding only the *classified* information but does not excuse the failure to provide notice of, and access to, the unclassified information used to prohibit the transaction.[19] *See NCRI*, 251 F.3d at 208-09. That Ralls had the opportunity to present evidence to CFIUS and to interact with it, then, is plainly not enough to satisfy due process because Ralls never had the opportunity to tailor its submission to the Appellees' concerns or rebut the factual premises underlying the President's action. *See Greene*, 360 U.S. at 496; *NCRI*, 251 F.3d at 205; *Schweiker*, 716 F.2d at 32.

The Appellees' arguments for distinguishing the FTO cases are unconvincing. First, and contrary to the district court, we read *NCRI* and its progeny to hold that disclosure of unclassified evidence *is* required by the Due Process Clause and not simply because the unclassified information is going to be disclosed in any event. Our decisions applying *NCRI* make this clear. *See, e.g.*, *PMOI II*, 613 F.3d at 227 ("[D]ue process *requires* that the PMOI be notified of the unclassified material on which the Secretary proposes to rely and an opportunity to respond to that material *before* its redesignation [as an FTO]." (emphases added)). Nor does the uniqueness of the FTO

---

[19] Because the record did not reflect whether the evidence relied on was classified, unclassified or both, we issued an order before oral argument requesting that the Government be prepared to discuss the nature of the evidence reviewed by CFIUS and the President. Responding to our inquiry at oral argument, the Appellees' counsel stated that CFIUS and the President relied on both classified and unclassified evidence.

context distinguish those decisions. As we noted in *NCRI*, what was "unique" about AEDPA was the "dearth of procedural participation and protection afforded the designated entity." 251 F.3d at 196. Given the similar lack of procedural protection afforded by the Congress in the DPA, we find the FTO precedent precisely on point.

The Appellees' argument that we should refrain from requiring disclosure of the President's thinking on sensitive questions is off-base. Our conclusion that the procedure followed in issuing the Presidential Order violates due process does not mean the President must, in the future, disclose his thinking on sensitive questions related to national security in reviewing a covered transaction. We hold only that Ralls must receive the procedural protections we have spelled out before the Presidential Order prohibits the transaction. The DPA expressly provides that CFIUS acts on behalf of the President in reviewing covered transactions, *see* 50 U.S.C. app. § 2170(b)(1)(A) (review conducted by "President, acting through [CFIUS]"), and the procedure makes clear that the President acts only after reviewing the record compiled by CFIUS and CFIUS's recommendation, *see* 31 C.F.R. § 800.506(b), (c). Adequate process at the CFIUS stage, we believe, would also satisfy the President's due process obligation. As for the Appellees' belated assertion of executive privilege, this argument was not raised in the Appellees' brief and we leave it to the district court on remand to consider whether the executive privilege shields the ordered disclosure.

In sum, we conclude that Ralls possesses substantial property interests and that the Presidential Order deprives Ralls of its interests without due process of law.

### III. CFIUS ORDER CLAIMS

We next consider the district court's dismissal of Ralls's CFIUS Order claims as moot inasmuch as the CFIUS Order was expressly revoked by the Presidential Order.

Under Article III of the Constitution, a federal court "may only adjudicate actual, ongoing controversies." *Honig v. Doe*, 484 U.S. 305, 317 (1988). "This limitation gives rise to the doctrine[] of . . . mootness," *Foretich v. United States*, 351 F.3d 1198, 1210 (D.C. Cir. 2003), which precludes judicial review where "events have so transpired that [a judicial] decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future," *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (*en banc*) (quotation marks omitted). "It is a basic constitutional requirement that a dispute before a federal court be 'an actual controversy extant at all stages of review, and not merely at the time the complaint is filed.' " *Newdow v. Roberts*, 603 F.3d 1002, 1008 (D.C. Cir. 2010) (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974)) (brackets and ellipsis omitted).

Both parties appear to acknowledge that Ralls's CFIUS Order claims were mooted when the Presidential Order revoked the CFIUS Order and deprived it of any effect. Ralls contends, however, that we may nonetheless consider the claims under the "capable of repetition yet evading review" exception to mootness. To satisfy the exception, a party must demonstrate that "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again." *Clarke*, 915 F.2d at 704 (second alteration added). "When these two circumstances are simultaneously present, the plaintiff has demonstrated an exceptional circumstance in

which the exception will apply." *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 322 (D.C. Cir. 2009) (quotation marks, citation and brackets omitted). We conclude that Ralls has established both prongs of the exception.

## A. EVADING REVIEW

A challenged action evades review if it is too short in duration to be fully litigated in the United States Supreme Court before it expires. *See Christian Knights of Ku Klux Klan Invisible Empire, Inc. v. District Columbia*, 972 F.2d 365, 369-70 (D.C. Cir. 1992) (citing *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 547 (1976)); *Del Monte Fresh Produce Co.*, 570 F.3d at 322. As a rule of thumb, "agency actions of less than two years' duration cannot be 'fully litigated' prior to cessation or expiration, so long as the short duration is typical of the challenged action." *Del Monte Fresh Produce Co.*, 570 F.3d at 322; *accord Performance Coal Co. v. Fed. Mine Safety & Health Review Comm'n*, 642 F.3d 234, 237 (D.C. Cir. 2011); *Pub. Utilities Comm'n of Cal. v. FERC*, 236 F.3d 708, 714 (D.C. Cir. 2001); *Burlington N. R.R. v. Surface Transp. Bd.*, 75 F.3d 685, 690 (D.C. Cir. 1996). In addressing whether a matter can be fully litigated, we do not consider the availability of expedited review. *See Washington Post v. Robinson*, 935 F.2d 282, 287 n.6 (D.C. Cir. 1991); *In re Reporters Comm. for Freedom of the Press*, 773 F.2d 1325, 1329 (D.C. Cir. 1985).

Notwithstanding the two-year rule of thumb, a party may not assert that his claim evades review if his own dilatory conduct has prevented full consideration of the claim. *See Armstrong v. FAA*, 515 F.3d 1294, 1296 (D.C. Cir. 2008). In *Armstrong*, the Federal Aviation Administration (FAA) issued an order revoking the petitioner's pilot's license. *Id.* at 1295. In issuing the order, the FAA made an "emergency" determination, which permitted it to impose the order without

first providing Armstrong an opportunity to respond. *Id.* Armstrong timely sought administrative review of the FAA order but sought judicial review of the separate emergency determination only after seventy-nine days had lapsed. *Id.* at 1295-96. While his petition was pending here, Armstrong requested, and was granted, a two-week extension to file his reply brief. *Id.* at 1296. His challenge to the emergency determination was then mooted when the National Transportation Safety Board (NTSB) upheld the FAA revocation order. *Id.* We concluded that Armstrong could not satisfy the "evading review" prong of the mootness exception because his own "lassitude . . . allowed his case to become moot." *Id.* By waiting seventy-nine days to seek review of the emergency determination and requesting a two-week extension to file his reply brief, he "made it impossible for us to say the [emergency determination] . . . was too short-lived to be reviewed." *Id.* at 1297. We also relied on the fact that he made no effort to stay the administrative proceedings that mooted his challenge to the emergency determination. *Id.*; *accord Newdow*, 603 F.3d at 1008-09.

Relying on *Armstrong*, the district court concluded that, despite the short duration of the CFIUS Order, Ralls's "claims d[id] not meet the 'evading review' component of the mootness exception." *Ralls Corp.*, 926 F. Supp. 2d at 97. It explained that "Ralls's own decisions to delay filing its complaint" challenging the CFIUS Order for "forty-one (if not forty-two) days" and "to withdraw its motion for TRO/PI prevented the Court from considering its claims" before the order expired.[20] *Id.* at 96-97. Although the Appellees do not defend the district court's "evading review" holding on appeal,

---

[20] As noted earlier, *see supra* p. 11, Ralls's TRO/PI motion was set to be heard on September 20, 2012, eight days before the Presidential Order revoking the CFIUS Order issued.

we nonetheless address this component of the mootness exception to satisfy our duty to establish jurisdiction.

We conclude that the CFIUS Order "evades review." The CFIUS Order was in effect for only fifty-seven days—a typically short duration mandated by the DPA and implementing regulations, *see supra* pp. 3-6—before it was revoked by the Presidential Order. *See Del Monte Fresh Produce Co.*, 570 F.3d at 322 (action with duration less than two years evades review "so long as the short duration is typical of the challenged action"). During the seventy-five-day window in which CFIUS acts—the thirty-day review period plus the forty-five-day investigation period, *see* 50 U.S.C. app. § 2170(b)(1)(E), (2)(C)—it has broad authority to mitigate the security risks posed by covered transactions, *see id.* § 2170(*l*)(1)(A). But CFIUS may not, by itself, permanently suspend or prohibit a covered transaction. Instead, if CFIUS effectively freezes a transaction, as it did here, and believes the freeze should remain in place *after* its seventy-five-day action period concludes, it must submit the matter to the President. *See* 31 C.F.R. § 800.506(b)(1) ("[T]he Committee *shall* send a report to the President requesting the President's decision if . . . [t]he Committee recommends that the President suspend or prohibit the transaction."). Because the President must issue a decision within fifteen days, *see* 50 U.S.C. app. § 2170(d)(2), no CFIUS order freezing a transaction can last for more than ninety days before it expires or is superseded by a presidential decision.[21] Absent an expedited appeal, which we do not consider in conducting the "evading review" analysis, *see Robinson*, 935 F.2d at 287 n.6; *In re Reporters Comm. for Freedom of the Press*, 773 F.2d at 1329, a CFIUS order is too short-lived to

---

[21] The CFIUS Order acknowledges as much, stating that it lasts "until CFIUS concludes action or the President takes action . . . or upon revocation by CFIUS or the President." JA 88.

obtain Supreme Court review and therefore evades review. *See, e.g.*, *Del Monte Fresh Produce Co.*, 570 F.3d at 322.

*Armstrong* does not lead to a contrary conclusion. Even if Ralls had sought judicial review of the CFIUS Order on the day it issued, it could not have obtained review by the district court, this Court and the Supreme Court before the order was revoked. The same is true for CFIUS mitigation orders that last for the full ninety days as "trial and appellate proceedings routinely take more than twelve months to complete." *Christian Knights of Ku Klux Klan*, 972 F.2d at 370. Not so in *Armstrong*: Had Armstrong acted with more alacrity, he might have been able to obtain review of the FAA emergency determination in this Court and the Supreme Court—just two levels of review—before the administrative proceeding mooted his claim. *See Armstrong*, 515 F.3d at 1295-96.

Moreover, we attach no significance to Ralls's withdrawal of its TRO/PI motion. Although Ralls gave up the opportunity to obtain *district court* review of its CFIUS Order claims, the claims could not have been "fully litigated" through the Supreme Court in fifty-seven days. *See Del Monte Fresh Produce Co.*, 570 F.3d at 322; *Christian Knights of Ku Klux Klan*, 972 F.2d at 369. Nor could Ralls have prevented its claims from becoming moot by pressing its motion *a la Armstrong*. Ralls's motion asked the court to "enter a temporary restraining order enjoining enforcement of [the CFIUS Order], schedule a hearing on Ralls's request for a preliminary injunction . . . [and] enter a preliminary injunction enjoining further enforcement of the order during the pendency of this litigation." Mot. for TRO/PI 2, *Ralls Corp. v. Comm. on Foreign Inv. in the U.S.*, No. 1:12-cv-01513 (D.D.C. Sept. 13, 2012). Had Ralls's motion been granted, enforcement of the CFIUS Order would have been enjoined but there is no indication that the CFIUS process would have stopped in its

44

tracks.   To the contrary, CFIUS likely would have submitted the matter to the President by the end of the seventy-five day period, as it is required to do, and the presidential decision would have mooted Ralls's CFIUS Order claims.   In *Armstrong*, had Armstrong successfully moved to enjoin the administrative proceeding, his claim most likely would not have been mooted.   515 F.3d at 1295-96; *see also Nedow*, 603 F.3d at 1008-09.

## B. CAPABLE OF REPETITION

Action is "capable of repetition" if there is "a reasonable expectation that the same complaining party [will] be subjected to the same action again."   *Christian Knights of Ku Klux Klan*, 972 F.2d at 370 (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975) (*per curiam*)).   The "same action" generally "refer[s] to particular agency policies, regulations, guidelines, or recurrent identical agency actions."   *Pub. Utilities Comm'n*, 236 F.3d at 715 (quotation marks omitted).   The question is not "whether the precise historical facts that spawned the plaintiff's claims are likely to recur" but "whether the legal wrong complained of by the plaintiff is reasonably likely to recur."   *Del Monte Fresh Produce Co.*, 570 F.3d at 324.   The Supreme Court has instructed that the capable-of-repetition prong is not to be applied with excessive "stringency."   *Honig*, 484 U.S. at 318 n.6.   In other words, a controversy need only be "*capable* of repetition," not "more probable than not."   *Id.* (emphasis in original); *accord Doe v. Sullivan*, 938 F.2d 1370, 1378-79 (D.C. Cir. 1991) ("It is enough   .  .  . that the litigant faces some likelihood of becoming involved in the same controversy in the future." (quotation marks omitted)).

*Doe v. Sullivan* demonstrates that a controversy is *capable* of repetition even if its recurrence is far from certain.   There, a U.S. service member serving in Operation Desert Shield

brought a putative class action challenging a Food and Drug Administration (FDA) regulation permitting it to "make the determination that obtaining informed consent from military personnel for the use of an investigational drug . . . is not feasible in certain battlefield or combat-related situations." 938 F.2d at 1373. The FDA determined that "obtaining informed consent was not feasible" for the use of two investigational drugs sought to be used to defend against a chemical weapons attack. *Id.* at 1374. By the time the case reached this Court, however, the military operation had ended, *id.* at 1375, and the service member's claims were therefore mooted. We nevertheless concluded that the challenged action was capable of repetition, *i.e.*, there was "some likelihood" it would recur, because of the challenger's "continuing status as a member of our armed forces" and the FDA's likely retention of the regulation. *Id.* at 1378-79. We reached this conclusion notwithstanding the fact that the "next conflict [was] not yet upon us." *Id.* at 1379.

The district court concluded that Ralls "failed to demonstrate that there is a reasonable expectation that it will be subject to the same action again in the future." *Ralls Corp.*, 926 F. Supp. 2d at 97. Although the court accepted Ralls's claim that it intended to engage in covered transactions involving the acquisition of windfarms across the United States, the court decided there was not "a reasonable likelihood that Ralls's purchase of a different windfarm in a different location will necessarily give rise to the same response." *Id.* at 99. The Appellees similarly contend that CFIUS issued its Order "in response to the particular concerns that arose in the Committee's review of the particular transaction, involving a particular geographic region" and therefore Ralls cannot show that such a context-specific decision is likely to recur. Br. for the Appellees 46.

We disagree. Ralls alleged in its amended complaint that it "intends to continue pursuing windfarm development opportunities in the United States and acquiring existing windfarm greenfield companies to do so, in the manner of its acquisition of the Project Companies." Am. Compl. ¶ 71. Taking this allegation as true, as we must at the dismissal stage, *see El-Shifa*, 607 F.3d at 839; *Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 572 n.1 (D.C. Cir. 2003), it is clear that Ralls intends to enter into covered transactions subject to CFIUS jurisdiction. The only uncertainty comes from assessing CFIUS's response thereto. We think there is "some likelihood" CFIUS will again respond similarly in the future. *Doe v. Sullivan*, 938 F.2d at 1379. As Ralls's amended complaint alleges, and as counsel for the Appellees conceded at oral argument, other foreign-owned windfarms using foreign-made wind turbines operate without governmental interference near the same restricted airspace as the Butter Creek projects. We can thus infer therefrom that mere proximity of the Project Companies to the restricted air space is not the only factor that precipitated the CFIUS Order. But even if proximity to restricted airspace is a prominent concern of CFIUS, there is some likelihood that Ralls will again acquire easements to project sites near security-sensitive Government property and/or airspace given Ralls's intention to continue its practice of pursuing windfarm projects "throughout the United States." Am. Compl. ¶¶ 58, 71; *see also* Reply Br. 29 n.10, *Ralls Corp. v. Comm. on Foreign Inv. in the U.S.*, No. 13-5315 (D.C. Cir. Apr. 1, 2014). Indeed, we think this contingency is at least as likely, if not more likely, than the likelihood in *Doe* that the service member would participate in an armed conflict in the future that also involved the use of chemical weapons.[22] *See id.* Finally, CFIUS has

---

[22] To support their assertion that the CFIUS Order was precipitated by unique factual circumstances not likely to recur, the

given no indication it will provide any more process in the future; the Appellees' position is that Ralls was provided all the process it was due. Accordingly, we find that Ralls has satisfied both prongs of the capable-of-repetition-yet-evading-review exception to mootness.

\* \* \* \* \*

In sum, we conclude that the Presidential Order deprived Ralls of constitutionally protected property interests without due process of law. We remand to the district court with instructions that Ralls be provided the requisite process set forth herein, which should include access to the unclassified evidence on which the President relied and an opportunity to respond thereto. *See NCRI*, 251 F.3d at 209 (leaving FTO designation in place and ordering Secretary of State to provide designated entity with access to unclassified evidence supporting designation and opportunity to respond). Should disputes arise on remand—such as an executive privilege claim—the district court is well-positioned to resolve them. Finally, because the CFIUS Order claims were dismissed on a jurisdictional ground, and given the scant merits briefing, we leave it to the district court to address the merits of Ralls's remaining claims in the first instance.[23]

*So ordered.*

---

Appellees argue that "Ralls has completed other transactions that have not caused CFIUS to issue mitigation orders." Br. for the Appellees 46 (citing JA 36, 95-96). But those transactions are not "covered transactions" and are thus plainly distinguishable.

[23] These claims include Ralls's APA challenge to the CFIUS Order (Counts I and II), its *ultra vires* challenge (Count III) and its due process and equal protection challenges (Counts IV and V, in part).